*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| RONALD H., | ) |
| | ) Supreme Court No. S-17890 |
| Appellant, | ) |
| | ) Superior Court Nos. 3PA-17-00069/ |
| v. | ) 00070 CN |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) O P I N I O N |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No.7541 – July 14, 2021 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Jay Hochberg, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Rachel Levitt, Assistant Public Advocate, Palmer, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Maassen, Carney, and Borghesan, Justices. [Bolger, Chief Justice, not participating.]

BORGHESAN, Justice.

## I.    INTRODUCTION

The superior court terminated a father's parental rights to his two children after finding them children in need of aid because of their father's domestic violence and

aggressive behavior. The children are Indian children under the Indian Child Welfare Act (ICWA). Therefore the Office of Children's Services (OCS) was required to make active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family.[1]  At the termination trial, the superior court found clear and convincing evidence that OCS made active efforts but that these efforts proved unsuccessful.

The father appeals, arguing only that the superior court's active efforts finding was made in error. We conclude that the superior court did not err in finding that active efforts were made and affirm the termination order.

## II.    FACTS AND PROCEEDINGS

### A.    Removal And Case Plan Progress Prior To June 2017

Ronald H. and Angela A. began their relationship in January 2014.[2]  The couple had two children together: Alice, born in January 2015, and Harold, born in April 2016.[3]  Both Alice and Harold are "Indian Children" for purposes of ICWA.[4]

---

[1]    *See* 25 U.S.C. § 1912(d) (2018), *declared unconstitutional by Brackeen v. Haaland*, 994 F.3d 249 (5th Cir. 2021); *but see id.* at 445 (Costa, J., concurring in part and dissenting in part) (citing *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) (noting that state courts are not required to follow a federal circuit court's interpretation of federal law)).

[2]    Many of the facts in this opinion are drawn from our decision in Ronald's previous appeal of the adjudication order in this case. *See Ronald H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-16725, 2018 WL 1611648, at *1 (Alaska Mar. 28, 2018). We use the same pseudonyms in this opinion to protect the family's privacy.

[3]    *Id.*

[4]    25 U.S.C. §§ 1901-1963. ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such
(continued...)

Angela also has a third child from another relationship, Andrew, who was born in January 2007.[5] Ronald and Angela are no longer in a relationship together and do not plan to reunite.

In January 2016 Ronald and Angela had a heated argument. Following the argument, Angela told Andrew to shut off the television while Ronald was watching it. When Andrew did so, Ronald grabbed him, picked him up by his shirt, and slammed him to the floor. Angela, who was holding Alice in her lap, captured the incident on video. Ronald was arrested and ultimately convicted of assault in the fourth degree.

OCS received a protective services report following Ronald's arrest. Because Ronald was jailed following the assault and was not expected to return to the home, OCS did not immediately take custody of the children; but after OCS workers saw Angela's video, they concluded that the children should be taken into custody.[6] Andrew was removed from the home that day; Alice and the newborn Harold were taken into custody early the next morning.[7] At a temporary custody hearing several days later, the superior court found probable cause to believe the children were in need of aid and concluded it would be contrary to their welfare to return to the family home. The

---

[4] (...continued)
children in foster or adoptive homes which will reflect the unique values of Indian culture." *Id*. § 1902. An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id*. § 1903(4).

[5] *Ronald H.*, 2018 WL 1611648 at *1.

[6] *Id.*

[7] *Id.*

superior court encouraged OCS to find a way for Angela to have contact with the children but stated that Ronald should have "very limited contact" with them.[8]

OCS developed a case plan for both parents in September 2016; it required Ronald to participate in a behavioral health assessment, attend parenting classes, and participate in a batterer's intervention program.[9] The plan also required Angela to receive a mental health assessment, attend a domestic violence support group, participate in parenting classes, and work with a tribal social services program.[10] The plan indicated that OCS would support Ronald and Angela by providing financial assistance for assessments, providing referrals and transportation to recommended treatments, communicating with tribal family services, and supervising visitation.[11] Ronald and Angela made progress on the case plan at first, but over time their relationship with OCS began to deteriorate and their progress on the case plan slowed.[12] As a result, OCS concluded that Alice and Harold would be at risk if they were returned to their parents' custody.[13]

B.   **Adjudication Trial, Disposition Hearing, And Prior Appeal**

A three-day adjudication trial commenced in September 2016.[14] In January 2017 the superior court issued an order that Andrew, Alice, and Harold were children in

---

[8]     *Id.*

[9]     *See id*. at *2.

[10]    *Id.*

[11]    *Id.*

[12]    *Id.*

[13]    *Id.*

[14]    *Id.*

need of aid because Ronald had assaulted Andrew, there was a history of domestic violence between Ronald and Angela, and domestic violence had occurred in front of the children.[15] Ronald and Angela appealed the adjudication orders pertaining to Alice and Harold, arguing that the superior court erred by finding that Alice and Harold were children in need of aid and by finding that OCS had made active efforts in providing remedial services to prevent the breakup of the family.[16]

We rejected those arguments and affirmed the superior court on all grounds.[17] Ronald and Angela's argument that OCS did not make active efforts was based on a series of alleged delays.[18] They also argued that OCS did not adequately assist Ronald with his psychological evaluation, provide him with alternative programming for the batterer's intervention program, or address his concerns about the time and expense of attending the program.[19] We concluded that because "OCS's efforts [were] analogous to efforts that have been found to justify active efforts findings in past cases," they amounted to active efforts under ICWA.[20]

We also noted that Ronald did not participate in several of the programs recommended to him by OCS, including further psychological evaluation and the

---

[15]    *Id.*

[16]    *Id.* at *3.

[17]    *See id.* at *8.

[18]    *Id.* at *5.

[19]    *Id.* at *6.

[20]    *Id.*

batterer's intervention program.[21] And we observed that "[r]ather than working with OCS, Ronald yelled and swore at OCS workers when asked to adhere to visitation rules and intimated that he wished to commit violence against them."[22] Because "a parent's demonstrated lack of willingness to participate in treatment may be considered" when assessing OCS's efforts,[23] Ronald's "unwillingness to fully participate in his case plan and his hostility towards OCS" supported the superior court's ruling that OCS's efforts were sufficiently active.[24]

### C. Efforts Made By OCS Between January 2017 And June 2019

#### 1. Psychiatric evaluation with Dr. Grace Long

Ronald was referred by OCS to Dr. Grace Long for a psychiatric evaluation, which she completed in January 2018. Dr. Long found that Ronald's cognition fell in the borderline range and that he had difficulties with reading. Her diagnostic impressions included "an adjustment disorder with mixed disturbance of emotions and conduct," major depression, and an unspecified personality disorder. Dr. Long recommended that Ronald receive therapeutic counseling, anger management treatment, parenting education, case management, and domestic violence education and intervention. Dr. Long also recommended that Ronald get another psychiatric evaluation for possible use of medication to address the symptoms of depression, anxiety, cognitive rumination, and disturbed sleep patterns. Dr. Long later noted in her trial testimony that

---

[21] *Id.*

[22] *Id.*

[23] *Id.* (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 527 (Alaska 2013)).

[24] *Id.*

Ronald needed to address his psychological turmoil and anger to prevent him activating fear in Alice and Harold and to allow him to put their needs before his own.

## 2. Services targeted at domestic violence and mental health

In February 2018 Ronald was referred to Alaska Family Services for a batterer's intervention program. He began his classes in May under a volunteer work-to-pay program but was discharged from the program because a court entered a new domestic violence protective order (DVPO) against him; he also failed to maintain contact with the program. Ronald never finished the batterer's intervention program.

OCS assigned a new caseworker to Ronald in December 2018. That caseworker developed another case plan for Ronald in January 2019 to address OCS's mental health and behavior concerns. The case plan included several goals with discrete tasks for Ronald. That caseworker testified that she went over the recommendations from Dr. Long's neuropsychological evaluation with Ronald in person (some of which she incorporated into his new case plan) and discussed how she and Ronald could work together to make sure Ronald could complete everything in the plan. She instructed him to obtain individual counseling and gave him a contact list of providers that accepted Medicaid. She testified that she tried to set up appointments for Ronald with several of the providers but was barred from doing so due to HIPAA restrictions. She explained that Ronald first had to choose a provider, then sign a release of information for that provider, and only then could OCS make a referral and proffer collateral information to the provider. She testified that Ronald did not tell her which provider he wanted to receive services from, and he never executed a release of information for any provider so OCS could set up the appointment.

The caseworker testified at trial that Ronald failed to call the providers and instead complained to her about the distance to a provider or that a provider's phone number was incorrect. She made sure all the numbers were correct and tried to help

Ronald arrange services. But Ronald did not sign up for services at the time; when he finally did, he got on the waitlist for services at Providence, which was six to nine months long.

The case plan required Ronald to take domestic violence classes, meet weekly with a parent navigator to discuss coping and stress skills at Alaska Youth & Family Network (AYFN); and take an assessment at Fathers Insync, a social services organization for fathers, then follow all recommendations. His caseworker sent a referral to Fathers Insync and paid for an assessment. The assessment at Fathers Insync recommended the batterer's intervention program, which Ronald started but was eventually asked to leave due to his disruptive behavior and lack of payment for services. His caseworker then referred him to Alaska Family Services (AFS), but Ronald refused to pay the co-pay and demanded that OCS pay for it instead, which according to his caseworker, OCS was not authorized to do. Ronald was also then referred to AYFN for domestic violence classes but was discharged for being disruptive and not taking feedback from AYFN's parent navigator.

Ronald's caseworker testified that she spent more time with Ronald than any other parent on her caseload. According to his caseworker, Ronald would come to the OCS offices at times without an appointment, demanding to see the caseworker. He would contact the caseworker via phone or email up to 15 times per day; as a result, she tried to meet with him once per week. Because of the volume of his emails, his caseworker directed them into their own folder, and she would respond to them at the end of the day. She testified that she found written communication with Ronald more effective because she could ensure that he received all of the information.

In October 2019 a new caseworker took over Ronald's case. The second caseworker testified that he communicated with Ronald via email about his case plan. According to the second caseworker, Ronald did not start mental health counseling until

the end of 2019, about six months after the termination petition had been filed and a month before the trial started. Ronald had not started his domestic violence or anger management classes by February 2020.

### 3. Visitations at AYFN and OCS

In 2018 Ronald had visitation twice a week at AYFN in conjunction with parent navigation services, which provided Ronald with parent coaching and modeling. In October AYFN cancelled Ronald's visitation because Angela got a DVPO against him. Then in April 2019 a new visitation supervisor, Unified Families, notified OCS that it would no longer be providing visitation to Ronald because of his behavior during the visits.

Because AFS and AYFN had already refused to offer Ronald visitation, the only option for his visits was at the OCS office.[25] OCS workers testified that when visits were moved to the OCS office, however, Ronald continued his disruptive behavior. During one visit, Ronald took pictures of his children holding signs saying they had been kidnapped, which he then posted on social media. Ronald often called 911 while at OCS, causing the entire office to go on lockdown and ending other families' visitation. At one point, because other families did not feel safe, OCS had to stop all other families' visitations during Ronald's visits. OCS supervisors often had to get involved when Ronald was at the OCS office for visitation. For example, Ronald once tried to enter a locked area and backed an OCS employee into a corner, prompting security to intervene to de-escalate the situation. In another supervised visit, rather than engaging with the

---

[25] At some point AYFN reinstated Ronald's visitation privileges, but only on the condition that his sessions take place outside of business hours, when no other clients were present, and that OCS supervise them. OCS decided to continue visitation at its office instead.

children, Ronald took pictures of his caseworker, made voice recordings, refused to follow directions, and argued with her.

In an attempt to avoid Ronald's disruptions at OCS's office, OCS eventually used video visitation for Ronald's family. But when OCS called Ronald for visits, he sometimes did not answer. By the end of the trial Ronald's visitation with Alice and Harold was limited to letters because OCS concluded that Ronald was unable to regulate his behavior in his children's presence.

### 4. Alice's sexual abuse reports

While visiting with Ronald on May 9, 2018, Alice told him that she had taken all her clothes off while "playing tag in the woods with the boys," including her half-brother Andrew. The visitation supervisor from United Families noted this report in the visitation notes and emailed them to an OCS worker that day. Ronald and OCS were aware of Andrew's prior instances of sexually inappropriate behavior. About a week later, Alice disclosed to Ronald that she had "been to the woods again." This was recorded again in the visitation notes and emailed to an OCS worker. Ronald expressed anger that OCS had not taken Alice to the doctor; he also called law enforcement twice that day to report the sexual abuse of his daughter. Visitation notes indicate that Alice was scheduled for an appointment at the Children's Crisis Center the next day, but the record does not indicate that this interview occurred.

Ronald's caseworker encouraged him to "call intake and make a service report," but Ronald said "he couldn't do that because he makes too many reports and they don't believe him." His caseworker testified that she interviewed Alice in response to these disclosures. Alice did not disclose any abuse to the caseworker, and the caseworker found no evidence of abuse or maltreatment. The caseworker also notified the guardian ad litem about the allegations.

A few months later Ronald's family navigator at AYFN filed a report with OCS about the lack of supervision at the foster parent's home. She stated that Alice was reportedly exhibiting unusual and sexualized behavior. She told Ronald to make a new report of harm to OCS and let him know she would also contact OCS herself to share her own concerns.

Some time after these allegations were made, the Department of Health and Social Services' foster care licensing division conducted an official investigation of the foster home and later referred the allegations to law enforcement. Because the licensing investigations are confidential by statute,[26] Ronald's OCS workers received only a summary of the investigation. The summaries show that forensic interviews were conducted, but the licensing division did not recommend that the children be removed from the foster home.

Ronald continued to ask OCS to address his concerns about Alice experiencing sexual abuse. In July 2019 OCS moved the children based on its "concerns in the [foster] home." The new foster parent asked that Andrew be moved out of the house immediately due to "challenging behaviors." In October 2019, after Alice told her new foster parent that she had been sexually abused by Andrew and another boy, OCS reported the abuse to law enforcement. OCS obtained a forensic examination the following month. In this examination Alice alleged that her brother Andrew touched her vagina and buttocks underneath her clothing on multiple occasions.

### D.     The Superior Court's Findings And Termination Of Parental Rights

In June 2019 OCS petitioned the superior court to terminate Ronald and Angela's parental rights to Alice, Harold, and Andrew. After a termination trial that was

---

[26]     *See* AS 47.32.180; AS 47.32.010(b)(5).

held in February and June 2020, the superior court terminated Ronald's parental rights.[27] The court found proof beyond a reasonable doubt that returning the children to Ronald would likely result in serious emotional and physical damage, based on the testimony of Dr. Long and another expert witness. The court also found that OCS proved by clear and convincing evidence that Alice and Harold were children in need of aid under AS 47.10.011(2) (incarcerated parent), (8)(A) (mental injury), and (8)(B)(iii) (repeated exposure to domestic violence). The superior court found that termination of Ronald's parental rights was in the best interests of Alice and Harold, as Ronald's "aggressive and combative actions show he has not made the necessary behavioral changes that would enable him to safely parent" and that Alice and Harold, after spending "the majority of their lives" in OCS custody, "should not have to wait any longer to obtain permanency."

Ronald argued that OCS had failed to make active efforts to prevent the breakup of his family. Specifically, he argued that OCS filed a false DVPO petition to prevent him from completing the required batterer's intervention program. He also argued that case workers first ignored his reports that Alice was abused in her foster home and then retaliated against him for his repeated prompts to investigate. He also argued that OCS gave him no support in completing his case plan.

The superior court disagreed. It found that OCS "provided [Ronald] with written case plans based on [its] concerns regarding domestic violence," including one that was created in January 2019 following Ronald's psychological evaluation with Dr. Long. In the superior court's view, that case plan required Ronald to complete five discrete steps; it found that despite OCS's efforts Ronald had not satisfied most of them by the time of the termination hearing.

---

[27] A separate trial led to the termination of Angela's parental rights. It was held separately to enable Andrew to participate "without fear or intimidation" from Ronald.

The first step required Ronald to "demonstrate financial independence through obtaining housing and employment." But the superior court found that because Ronald refused to share the details of his housing and employment, OCS was unable to verify whether the step had actually been completed. The second step required Ronald to undergo a mental health assessment. But the superior court found he had refused to pursue those services that OCS had identified for him until shortly before the termination hearing.

The superior court found that the additional steps, which involved participation in remedial programs, were hindered by Ronald's behavior while attending those programs. The third step required Ronald to participate in parenting programs provided by Fathers Insync; but the superior court found that Ronald did not complete the program because he was being disruptive and failed to pay for the program. The fourth step required Ronald to undergo an assessment for a batterer's intervention program, which OCS paid for, and undertake any treatment recommended by the assessment. The superior court found that Ronald completed the assessment with AFS, but was discharged from the recommended batterer's intervention program due to months of disengagement with the program and because of a new DVPO issued against him. The superior court found that OCS arranged for Ronald to attend another batterer's intervention program through Recovery Connection in December 2019; however, Ronald had not attended those classes by the time of the termination hearing. The fifth step involved meeting with a peer navigator through AYFN. But the superior court found that Ronald was ultimately discharged from AYFN for being disruptive.

Similarly, the superior court found that OCS "made many efforts to facilitate visitation" for Ronald with his children; however, the court noted that Ronald would miss visits frequently, make other families and staff feel unsafe, refuse to follow

directions, discuss his parental rights case with his children, and even cause the OCS building to be locked down.

The superior court found Ronald's arguments that OCS blocked him from completing his case plan to be mostly unpersuasive and not supported by the evidence. The one exception was Ronald's argument that OCS failed to timely investigate the safety of Alice's placement in 2018 after Ronald alleged that Alice had told him about sexual abuse in her foster home. The court concluded that "[i]t [did] not appear . . . that [OCS] took [Ronald's] reports concerning [Alice] seriously." Yet the court concluded that "this failure does not defeat this [c]ourt's finding that, in light of the totality of evidence, [OCS] made active efforts to effect reunification."

Ronald appeals the termination order on the sole ground that OCS failed to make active efforts towards reunification.

## III.   STANDARDS OF REVIEW

Whether the evidence in the record supports the superior court's active-efforts ruling is a mixed question of law and fact.[28] "We review factual findings for clear error, reversing only if, after 'review of the entire record' . . . we are left 'with a definite and firm conviction that a mistake has been made.' "[29] Whether the superior court's factual findings in a termination of parental rights action satisfy ICWA is a question of law to which we apply our independent judgment.[30]

---

[28]   *See Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 761 (Alaska 2009).

[29]   *Id.* (quoting *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 672 (Alaska 2008)).

[30]   *Id.*

## IV.   DISCUSSION

### A.   ICWA Requires OCS To Make "Active Efforts" To Prevent The Breakup of An Indian Family.

"Before terminating parental rights to an Indian child, a court must find that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[31]  We have distinguished "active efforts" from merely passive efforts:

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition.  Active efforts . . . [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.  For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.[32]

Yet we have also acknowledged that " 'no pat formula' exists for distinguishing between active and passive efforts."[33]  Efforts must be evaluated on a

---

[31]   *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 399 P.3d 646, 654 (Alaska 2017).  This requirement applies even in situations that involve the termination of a non-Indian parent's rights to an Indian child.  *C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214, 1217 n.10 (Alaska 2001).

[32]   *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting CRAIG J. DORSAY, THE INDIAN CHILD WELFARE ACT AND LAWS AFFECTING INDIAN JUVENILES MANUAL 157-58 (1984)).

[33]   *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 527 (Alaska 2013) (quoting *A.A.*, 982 P.2d at 261).

case-by-case basis,[34] and OCS uses its discretion to tailor its efforts to the parents' "individual capabilities."[35] When evaluating whether OCS has met its active efforts burden, the superior court does not look at specific instances of conduct, but rather to OCS's "involvement in its entirety."[36] And the superior court may also consider "a parent's demonstrated lack of willingness to participate in treatment" when determining whether OCS's efforts were sufficiently active.[37] This is particularly relevant when efforts become passive due to lack of cooperation from the parent or parents; we have

---

[34]     *Id.*

[35]     *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1116 (Alaska 2010).

[36]     *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)); *see also Maisy W.*, 175 P.3d at 1269 (finding that OCS made active efforts when considering entirety of its efforts from February 2004 until March 2007 even though it conceded that it had failed to make active efforts for three months in 2005); *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002) (finding DFYS's failure to make active efforts in particular seven-month period was "insignificant in light of the extensive remedial efforts the state [had otherwise] provided throughout its involvement" with the family).

[37]     *Philip J.*, 314 P.3d at 528 (quoting *Maisy W.*, 175 P.3d at 1269) (upholding finding that OCS was excused from making active efforts because mother repeatedly declined to participate in treatment for mental health and alcohol counseling); *see also David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 778 (Alaska 2012) ("[Father's] refusal to speak with [his case worker] . . . undermines his argument that OCS should have arranged more than three [visitations] . . . ."); *Lucy J.*, 244 P.3d at 1117 (affirming superior court's active efforts finding because mother did not complete steps in her case plan or attend meetings arranged by OCS); *A.A.*, 982 P.2d at 262 (upholding finding of active efforts despite DFYS failing to develop case plan because father was unwilling to engage in treatment).

excused "further active efforts once the parent expresses an unwillingness to participate."[38]

## B. OCS Made Active Efforts To Prevent The Breakup Of Ronald's Family.

The children were removed from Ronald's custody due to his acts of domestic violence and aggression. OCS identified numerous services targeted at these issues and tried to help Ronald benefit from these services: a batterer's intervention program, integrated mental health services, a peer navigator and wraparound services at AYFN, and visitation with his children. Yet the superior court found that Ronald refused to engage with some of these services and was discharged from others for being disruptive and combative. Ronald largely ignores this problem and instead focuses on things he believes OCS should have done differently or with greater effort: providing services that were more culturally appropriate, doing more to help him obtain a medication evaluation, and communicating with him orally due to his cognitive challenges. Although OCS might have done more, Ronald does not convince us that it failed to provide active efforts, particularly in light of his own conduct that made it difficult for OCS to help him.

When OCS's efforts are viewed in their entirety, the evidence supports the superior court's conclusion that OCS met its burden to make active efforts. OCS referred Ronald to several domestic violence classes and batterer's intervention programs. It paid for some assessments and helped him find new classes after he was discharged from the first ones without finishing them. OCS also helped enroll Ronald in parenting programs and referred him to several mental health providers; although OCS itself could not

---

[38] *Philip J.*, 314 P.3d at 528 (quoting *Wilson W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 185 P.3d 94, 102 (Alaska 2008)).

directly sign him up, case workers provided Ronald the providers' contact information so he could contact them directly.

The record also shows that Ronald has, on the whole, been either unwilling or uncooperative in undertaking the tasks set forth by OCS and his case plan. The superior court found that Ronald refused to pursue mental health services until shortly before trial, was discharged from various services due to his own conduct, and thwarted efforts to provide visitation with his children. None of these findings is clearly erroneous. Ronald's caseworker testified that Ronald failed to call providers to receive mental health counseling. Testimony also indicated that Ronald was discharged from completing his weekly support groups and batterer's intervention programs for being too disruptive and failing to pay for the services. He was so disruptive and verbally aggressive during visitation with his children that OCS had to rearrange other parents' scheduled visitations to ensure their safety. He also took pictures during visitation of his children holding signs saying they had been kidnapped, which he then posted on social media.

As previously noted, we consider a parent's demonstrated lack of willingness or cooperation when determining whether OCS has made active efforts.[39] We have excused "further active efforts once the parent expresses an unwillingness to participate."[40] And "a parent's lack of cooperation may excuse minor faults in OCS's efforts."[41] Indeed, in Ronald's previous adjudication appeal we ruled that his

---

[39] *See id.* (willingness); *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011) (cooperation).

[40] *Philip J.*, 314 P.3d at 528 (quoting *Wilson W.*, 185 P.3d 94, 102 (Alaska 2008)).

[41] *Pravat P.*, 249 P.3d at 272.

"unwillingness to fully participate in his case plan and his hostility toward OCS" justified the level of efforts he had received.[42]  The same is true here.[43]

### 1. OCS's efforts were not inconsistent with the prevailing social and cultural conditions in the children's tribe.

Ronald argues that OCS presented no evidence of any attempts to maintain or reestablish the children's connection to their Native culture, citing the 2016 ICWA regulations by the federal Bureau of Indian Affairs (BIA).  But neither ICWA nor the BIA regulations expressly require OCS to connect Indian children with their Native culture.  Rather, the statute and regulations require OCS to make active efforts to *prevent the breakup of the family* by providing "remedial services and rehabilitative programs"[44] "in a manner consistent with the prevailing social and cultural conditions" of the Tribe and "in partnership with the Indian child and Indian child's parents, extended family members, Indian custodians, and Tribe" "[t]o the maximum extent possible."[45]

Moreover, the 2016 BIA guidelines clarify that ICWA gives state agencies like OCS significant discretion to determine how best to provide these efforts in light of

---

[42]     *Ronald H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-16725, 2018 WL 1611648, at \*6 (Alaska Mar. 28, 2018).

[43]     Ronald argues that the superior court's active efforts finding was tainted by its supposedly erroneous finding that OCS timely began the process under the Interstate Compact on the Placement of Children (ICPC) to place the children with their paternal grandmother (Ronald's mother) in Missouri.  But because the superior court did not rely on this finding about the ICPC process in its active efforts analysis, we reject this argument.

[44]     25 U.S.C. § 1912(d).

[45]     25 C.F.R. § 23.2 (2021).

the facts of the particular case.[46]  We have consistently observed that " 'no pat formula' exists for distinguishing between active and passive efforts."[47]  Both the text of the 2016 regulations and the implementation guidelines provide examples of active efforts under ICWA; however, these specific actions (or others) are not expressly required.[48]  Rather, "[a]ctive efforts are to be tailored to the facts and circumstances of the case."[49]

OCS worked with both Ronald and Angela, the children's Tribe, and extended family members with whom it placed the children.  OCS has involved the children's Tribe in case plan meetings with Angela and consulted the Tribe about ICWA-compliant placements.  OCS also placed the children with a foster parent who was an extended family member and an ICWA-preferred placement, and helped the foster parent meet the children's needs (e.g., well-child exams, dental care, clothing vouchers).  OCS also helped Angela access services through Southcentral Foundation, an Alaska Native-

---

[46]  *See* BUREAU OF INDIAN AFFAIRS, U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT § E.4 (2016) ("The minimum actions required to meet the 'active efforts' threshold will depend on unique circumstances of the case.  It is recommended that the State agency determine which active efforts will best address the specific issues facing the family and tailor those efforts to help keep the family together.  This will help active efforts to respond to the unique facts and circumstances of the case.").

[47]  *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 527 (Alaska 2013) (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[48]  *See* BUREAU OF INDIAN AFFAIRS, *supra* note 46, § E.4 ("The examples of active efforts provided in the ICWA regulations reflect best practices in the field of Indian child welfare, but are not meant to be an exhaustive list."); *see also* 25 C.F.R. § 23.2.

[49]  25 C.F.R. § 23.2.

owned healthcare provider.[50] These actions are examples of how OCS took "affirmative, proactive, thorough, and timely efforts" to "provide services and programs to the family."[51]

OCS also referred Ronald to a number of services to help address Ronald's aggression and domestic violence, including batterer's intervention programs and wraparound services. But Ronald was unable to complete many of the services due to his own conduct. Ronald does not explain why these services were not "consistent with the prevailing social and cultural conditions" or way of life of the children's Tribe, nor does he suggest there were more culturally appropriate services available that OCS failed to provide him.[52] We therefore reject Ronald's argument that OCS failed to comply with its obligations under the BIA regulations.

### 2. OCS made active efforts by helping Ronald access rehabilitative services and a psychological evaluation for medication.

Ronald argues that OCS did not use active efforts to help him obtain mental health services. His caseworker testified that she had given Ronald a list of providers; Ronald had to choose one and sign a release of information for that provider for OCS to make a referral and send collateral information to that provider. Ronald argues that OCS

---

[50] *See Josh L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 457, 463-64 (Alaska 2012) (citing *Dashiell R. v. State, Dep't of Health & Soc. Servs, Office of Children's Servs.*, 222 P.3d 841, 850 (Alaska 2009)) (observing that efforts made toward reunification on behalf of one parent are considered to be efforts towards other parent as well).

[51] BUREAU OF INDIAN AFFAIRS, *supra* note 46, § E.4.

[52] *See Addy S. v. Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-17257, 2019 WL 3216807, at *6 (Alaska July 17, 2019) (noting that ICWA expert's testimony did not clearly establish that alternative programs beneficial to parent were available and appropriate for parent's situation).

could have done more to "provide [him] with release of information forms so that she could assist him." Even if OCS had obtained blank copies of HIPAA release forms from each provider for Ronald to sign, Ronald would still have had to pick a provider to see. His caseworker testified that she explained this to Ronald, and the superior court expressly found that Ronald nevertheless refused to seek treatment until not long before the termination trial began. This finding is supported by Ronald's caseworkers' testimony and is not clearly erroneous. Ronald's unwillingness to seek treatment was the roadblock to his obtaining that treatment.

Ronald's argument that OCS failed to use active efforts to obtain a psychiatric evaluation for medication fails for the same reason. His second caseworker testified that he had referred Ronald to several local providers who could perform psychiatric evaluations or medication management. Because the superior court found that Ronald had until recently refused to pursue these referrals, we cannot say that the lack of medication evaluation reflects a failure of OCS efforts.

Ronald also argues that "[l]ack of funding was an obstacle to Ronald completing his treatment," particularly for two batterer's intervention programs that were "central to the rehabilitative needs of the case." He argues that OCS "did not attempt to contact programs to assist him in finances," nor did it "attempt[] to contact the [T]ribe to learn whether tribal funds might be available." This is not entirely accurate: OCS did pay for at least two assessments for Ronald. But regardless, Ronald was not prevented from obtaining services or discharged from them due solely to funding issues. As OCS points out, Ronald was ejected from the batterer's intervention program because a new domestic violence protective order had been issued against him. It was ultimately Ronald's own behavior, rather than any passive efforts on OCS's part, that prevented him from receiving the services he needed to reunify his family.

### 3. OCS's alleged failure to engage with Ronald via oral communication was not a lack of active efforts.

Ronald argues that OCS failed to exercise active efforts when it did not communicate with him orally and instead opted to use written communication despite Dr. Long's finding that Ronald had difficulty with reading. Ronald also argues that OCS violated the Americans with Disabilities Act (ADA) when it failed to communicate with him verbally. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[53] We have observed that "whether reunification services reasonably accommodated a parent's disability is already included within the question [of] whether active or reasonable efforts were made to reunite the family," making "an independent analysis under the ADA . . . unnecessary."[54]

Ronald's argument ignores a major problem: although OCS tried to communicate orally with Ronald, his behavior made it largely impossible to do so. Ronald's first caseworker had frequently interacted with Ronald in person and over the phone, but these conversations were often difficult and unproductive because of the "power struggles" and "constant redirection, trying to keep [Ronald] on topic." Ronald would "fixate on past OCS workers, past things [the current caseworker] had no control of." Ronald would call his caseworker up to 15 times per day, which made it difficult for her to handle her case load, and "belittle" her. His caseworker therefore used written

---

[53] 42 U.S.C. § 12132 (2018).

[54] *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1116 (Alaska 2010); *see id.* (concluding that if OCS "fails to take into account the parents' limitations or disabilities and make any reasonable accommodations, then it cannot be found that reasonable efforts were made to reunite the family" (quoting *In re Terry*, 610 N.W.2d 563, 570 (Mich. App. 2000))).

communication to give Ronald the information he needed. It was ultimately Ronald's own conduct that made it impossible for OCS to communicate with him in a way that accommodated his difficulty with reading. Therefore, OCS did not fail to make active efforts or violate the ADA when it communicated with him in writing.[55]

**C.    OCS's Delay In Investigating Sexual Abuse Of Ronald's Daughter While In Foster Care Did Not Negate OCS's Efforts To Reunify The Family.**

The superior court found that "[i]t [did] not appear . . . that [OCS] took [Ronald's] reports concerning [Alice] seriously." The record shows that Alice told Ronald during two visits in May 2018 that she took her clothes off to "play[] tag in the woods with the boys." After this report was brought to Ronald's caseworker's attention, the caseworker told Ronald to report the allegation to OCS intake. The caseworker also interviewed Alice (who did not disclose abuse to the caseworker) and informed the guardian ad litem. Although the record indicates that Alice may have been scheduled for a forensic interview, it does not indicate that an interview took place at that time. Later on, OCS referred the allegations to the Department of Health and Social Services' licensing division for investigation. Then in July 2019 OCS moved the children out of their foster home due to safety concerns; it is not clear from the record whether this was prompted by the results of the licensing investigation or was even related to the sexual abuse allegations. It was not until October 2019, when Alice told her new foster parent that she had been sexually abused by her older brother and another boy, that OCS reported the abuse to law enforcement and obtained a forensic interview, in which Alice disclosed to investigators that her brother had touched her genitals and buttocks over a year earlier.

---

[55]    *Id.*

-24-                                                    **7541**

It is deeply disturbing that Alice may have been sexually abused by her brother while in foster care. And we agree with the superior court that the record suggests OCS did not use best practices in investigating the reports of abuse when they first surfaced: Alice should have had a forensic interview with trained medical professionals or investigators, rather than an interview with Ronald's caseworker, when OCS first learned of the possible abuse. OCS's apparent failure to investigate these allegations as vigorously and effectively as possible understandably caused Ronald great anguish and increased his anger towards OCS.

If OCS neglects its duty to keep the children in its custody safe, it is conceivable that the fallout could undermine OCS's working relationship with the parent to such a degree as to negate other efforts OCS made to assist the parent. In such a situation, we might well find that OCS's failure to keep the child safe amounted to a failure of active efforts to reunify the family, absent special efforts to repair trust, address trauma, and put the parent back on track.

But we agree with the superior court that this is not such a case. Rather, the record shows that Ronald was antagonistic toward both OCS workers and other service providers long before Alice's allegations in May 2018.[56] It is simply not credible to maintain, as Ronald does, that had OCS responded with more urgency to his report of abuse, he "would have successfully completed his entire case plan." If indeed OCS failed to offer an apology to Ronald for the harm to Alice as he maintains, that is

---

[56] *See Ronald H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-16725, 2018 WL 1611648, at \*6 (Alaska Mar. 28, 2018) ("The record indicates that Ronald did not participate in further psychological evaluation that was recommended after his mental health assessment, nor did he participate in the batterer's intervention program that was included in his case plan. Rather than working with OCS, Ronald yelled and swore at OCS workers when asked to adhere to visitation rules and intimated that he wished to commit violence against them.").

regrettable. But we cannot conclude that the shortcomings of OCS's investigation negates its otherwise active efforts to provide Ronald the services and resources needed to reform his violent and aggressive behavior.

### D. Ronald's Allegations Of Racism Do Not Establish A Failure Of Active Efforts.

Ronald argues that OCS failed to exercise active efforts when its social workers appeared frustrated by his suggestions of racism. Ronald does not explain how a court should evaluate assertions of racial insensitivity by social workers within the largely objective framework for assessing whether OCS has made sufficient efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[57] Nor does he connect the assertion of racism to any tangible failure by OCS to provide him services needed to reform his conduct. Instead he focuses solely on the tenor of his interactions with OCS workers.

As with allegations that OCS failed to keep a child in its custody safe, it is conceivable that expressions of racial animus by an OCS worker could damage the relationship between OCS and the parent so much as to thwart otherwise active efforts. But Ronald does not point to any overt expressions of animus in the record. It is certainly possible that some of the friction between Ronald and his social workers was attributable to their different backgrounds and experiences, including Ronald's experience as a Black man. A parent like Ronald could argue to the superior court that it should not give much weight to testimony by social workers or service providers about the parent's hostility, aggression, or other perceived negative conduct because those perceptions reflect bias, implicit or explicit. It would be up to the superior court to decide what weight to give this testimony when determining whether OCS made active

---

[57] 25 U.S.C. § 1912(d), *declared unconstitutional by Brackeen v. Haaland*, 994 F.3d 249 (5th Cir. 2021).

efforts (or whether its relative lack of efforts was excused by the parent's conduct). Indeed, Ronald did assert below that OCS was hostile to him because of his race, and the superior court acknowledged this argument. But it did not make that finding and instead credited the testimony of social workers and service providers that Ronald was disruptive, threatening, and hostile. Ronald's brief largely ignores these findings about his behavior and does not argue that the superior court erred in making no express finding about racial hostility. Ronald therefore fails to show that racial animus or insensitivity negated the efforts OCS made to promote reunification of the family.

## IV.   CONCLUSION

The superior court's order terminating parental rights is therefore AFFIRMED.