NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ENZO C., | ) |
| | ) Supreme Court No. S-19299 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-23-00063 CN |
| v. | ) |
| | ) MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) AND JUDGMENT* |
| OF FAMILY & COMMUNITY | ) |
| SERVICES, OFFICE OF CHILDREN'S | ) No. 2112 – October 8, 2025 |
| SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, David A. Nesbett, Judge.

Appearances: Michael L. Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, for Appellant. Laura Fox, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Paul F. McDermott, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian ad Litem.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

---

\*      Entered under Alaska Appellate Rule 214.

## I. INTRODUCTION

Police arrested a father and charged him with the murder of his child's mother. The Office of Children's Services (OCS) took emergency custody of their child and filed a petition to initiate child in need of aid (CINA) proceedings. Shortly thereafter, OCS investigated various relative placement options and ultimately placed the child with a maternal relative. OCS also drafted multiple case plans for the father, though the scope of the plans was limited by the father's placement in a pretrial detention center and the conditions of his criminal case. Even so, OCS recommended services, met with the father multiple times, attempted to determine the child's tribe, and provided photos and updates related to his child and case.

After more than a year and a half, OCS moved to terminate the father's parental rights. The court found grounds to support termination, including that OCS made active efforts to prevent the breakup of the family, as required by the Indian Child Welfare Act (ICWA). On appeal, the father challenges only the court's active efforts findings. Because OCS made active efforts in light of the extremely limited rehabilitative services available, we affirm the order terminating the father's parental rights.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Sarah's murder and Enzo's arrest

Enzo C. and his partner Sarah had a child, Archer.[1] On February 17, 2023, Sarah was found dead at her home. Following an extended standoff with police later that day, Enzo was arrested and charged with murder before being placed in jail for pretrial detention. OCS took emergency custody of then-eight-month-old Archer and filed an emergency petition to adjudicate Archer as a child in need of aid.

---

[1]    We refer to all family members in this case pseudonymously.

## 2. OCS placement efforts

OCS assigned an initial caseworker for Archer. After considering multiple maternal placement options, OCS placed Archer with Sarah's cousin Jasper. Even after this placement, OCS continued to evaluate other family options including paternal relatives like Enzo's sister.

Although Archer did not have any formal affiliation with an Alaska Native tribe, given his birth at Alaska Native Medical Center and his father's proclaimed tribal affiliation, the court and parties treated the matter as an ICWA case.[2] OCS initially reached out to multiple tribes due to Archer's possible enrollment, but ultimately confirmed association with a tribe through Archer's paternal great-great-grandparents. OCS also prepared affiliation paperwork for both Enzo and Archer, and pursued participation by the identified tribe in various proceedings.

## 3. OCS case plan development efforts

OCS transferred Archer's case to another caseworker before the previous caseworker could meet with Enzo. Due to Enzo's ongoing criminal case, the new caseworker's supervisor recommended not meeting with Enzo without Enzo's legal counsel present. The caseworker and Enzo's counsel had difficulty aligning their schedules. They did not find a time to meet before Enzo's counsel left the Public Defender's Agency.

Although unable to meet with Enzo promptly, OCS created an initial case plan in June 2023. OCS also periodically shared photos of Archer since, per the conditions of release associated with Enzo's criminal case, there was to be "no contact [between Enzo and Archer] while in jail."

---

[2] Among other requirements, ICWA obligates OCS to make "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." 25 U.S.C. § 1912(d).

After five months without direct contact, in September 2023, the OCS caseworker decided to meet with Enzo alone. During that meeting, the caseworker and Enzo discussed case planning that assumed that Enzo would not be released for the foreseeable future, and Enzo expressed his support for the current placement but requested that Archer maintain contact with the paternal side of his family. As testified by the caseworker at trial, after the visit, Enzo's former counsel's supervisor at the Agency asked OCS that they "not . . . have any [further] contact with [Enzo] without a public defender present."

The two did not meet again until April 2024, alongside Enzo's new public defender. During their second meeting, the caseworker and Enzo discussed the extremely limited formal programs offered at the jail. In light of those constraints, the caseworker created a case plan which OCS described as "including activities that would be recommended if and when [Enzo] was released and able to participate." After their April 2024 meeting, Enzo began attending a parenting class at the jail though the caseworker was not aware of his attendance.

The caseworker and Enzo met a third time in September 2024. Enzo was still in jail during that meeting; despite having had a bail hearing, the conditions limiting his participation in remedial services or family contact had not changed. Even so, throughout this case, Enzo received periodic updates and photos detailing Archer's development.

## B. Proceedings

In April 2024, after Enzo had been incarcerated for about a year, OCS filed a petition seeking to terminate Enzo's parental rights over Archer. Following trial on October 15, 2024, the superior court terminated Enzo's parental rights and approved Archer's placement with Jasper's family.

In its written order shortly thereafter, the court found "clear and convincing evidence that [OCS had] made . . . active efforts to eliminate the need for removal and prevent the breakup of the family, but [that] those efforts were not

successful." The efforts it noted included "case planning, sending [Enzo] photographs of his son, meeting with [Enzo] at the jail, holding a [Team Decision Meeting] and making efforts to find relative placement, efforts to assist with tribal enrollment, home visits with [Archer], and efforts to inquire into services available in the jail." The court reiterated that these efforts were limited by Enzo's incarceration in a facility with limited resources, as well as the court order in his criminal case preventing contact with Archer.

The court terminated Enzo's parental rights. Enzo appeals, challenging only the court's determination that OCS made active efforts.

## III. STANDARD OF REVIEW

"Whether OCS made active efforts to prevent the breakup of a family is a mixed question of fact and law."[3] We review "the factual findings underlying an active efforts determination for clear error," and will reverse "only if a review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[4] "Whether those factual findings satisfy the requirements of ICWA is a question of law to which we apply our independent judgment, 'adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy.' "[5]

---

[3] *Anton K. v. Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 554 P.3d 456, 465 (Alaska 2024).

[4] *Id.* (quoting *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021)).

[5] *Id.* (alteration in original) (quoting *Native Vill. of Kwinhagak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 542 P.3d 1099, 1109 (Alaska 2024)).

## IV.  DISCUSSION

Enzo argues that OCS "failed to make active efforts," and therefore that the court's active efforts determination was unsupported.  In response, OCS argues that it did "provide[] active efforts under the circumstances."[6]

Generally, parental rights can only be terminated after a trial court finds by clear and convincing evidence that OCS made "reasonable efforts" to prevent the breakup of the family.[7]  However, in cases governed by ICWA, the bar is higher.[8]  "[I]n the case of an Indian child" OCS must prove, again by clear and convincing evidence, that it has made "active efforts" to "provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have been unsuccessful."[9]

We employ a "case-by-case approach" when determining whether OCS has complied with ICWA's active efforts requirement.[10]  In the case of incarcerated parents, "ICWA has no exception for incarceration,"[11] and neither the fact of "incarceration nor doubtful prospects for rehabilitation will relieve [OCS] of its duty

---

**6**      To the extent that OCS suggests that cases involving the alleged killing of one parent by another may relieve OCS of obligations under ICWA, we need not — and do not — reach that issue because we find OCS met its obligations here.

**7**      CINA Rule 18(c)(2)(A); AS 47.10.086(a).

**8**      25 U.S.C. § 1912(d).

**9**      CINA Rule 18(c)(2)(B); *see also Walker E. v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598 (Alaska 2021).

**10**      *Dale H. v. State, Dep't of Health & Soc. Servs.*, 235 P.3d 203, 213 (Alaska 2010); *see also* 25 C.F.R. § 23.2 ("Active efforts are to be tailored to the facts and circumstances of the case….").

**11**      *Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1021 (Alaska 2012).

under ICWA to make active remedial efforts."[12]  However, "[a] parent's incarceration significantly affects the scope of the active efforts that [OCS] must make," so "while [OCS] cannot ignore its ICWA duties merely because of [a parent's] incarceration, [the fact of] incarceration is a significant factor in our evaluation of the adequacy of [OCS's] efforts."[13]

We affirmed the termination of an incarcerated father's parental rights in a similar situation in *Anton K. v. Department of Family & Community Services, Office of Children's Services.*[14]  There, we ruled that OCS made active efforts to prevent the breakup of a family where the father was incarcerated for the assault of his children's mother.[15]  We considered the efforts OCS made to (1) facilitate visitation for the incarcerated father; (2) provide him rehabilitative services; and, (3) reunify the children with the mother and later place them with extended family.[16]  Although OCS's efforts to facilitate visitation with the incarcerated father were "significantly lacking," and although OCS's efforts to make rehabilitative services available to the father while incarcerated "were passive in some respects," OCS made active efforts to reunify the children with their mother and later place them with relatives.[17]  Given the practical difficulties presented by the father's incarceration, we gave "substantial weight" to

---

[12]    *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235 (Alaska 1996).

[13]    *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999).

[14]    554 P.3d 456 (Alaska 2024).

[15]    *Id.* at 459-60.

[16]    *Id.* at 468.

[17]    *Id.* at 468-71.

OCS's efforts toward reunification with the mother.[18]  Accordingly, we concluded that the efforts were active when "considered in their entirety" and affirmed termination.[19]

Our case law addressing incarceration and active efforts provides guidance for this case.  First, to satisfy the requirement of active efforts, OCS must take affirmative steps to help the parent satisfy the case plan it creates.[20]  Second, while rehabilitative services may be limited in a correctional setting, OCS must still take steps to assist the parent in accessing the services available in correctional facilities.[21]  Third, when a parent has been incarcerated and is likely to remain so for the foreseeable future, attempts to place the child with an extended family member count significantly toward active efforts, particularly when placed with a family member who supports the goal of reunification.[22]  While these guidelines do not create a set formula for active efforts toward incarcerated parents, and while we evaluate each case on its own circumstances, these three guidelines do apply to Enzo's case as follows.

### A.    OCS Made Active Efforts To Create And Implement A Case Plan.

Enzo argues that OCS should have "take[n] [him] through the steps of the plan rather than requiring that the plan be performed on its own."  But OCS did more than merely draw up a case plan for Enzo, although plan options were not as broad as those that may have been available if Enzo had not been incarcerated.  For instance,

---

[18]    *Id.* at 472.

[19]    *Id.* at 471-72.

[20]    *Id.* at 465-466 (citing 25 C.F.R. § 23.2 (2024)).

[21]    *Id.* at 469-70 (explaining that "[t]he circumstances of [the father's] incarceration," including lack of domestic violence intervention program at his facility, "made it impossible or impractical for OCS to provide some of the services listed in his case plan, which affect[ed] our assessment of OCS's efforts").

[22]    *Id.* at 464-67, 471 (holding, after OCS's investigation and denial of three paternal placement options, that "significant efforts . . . to place the children with members of [the father's] family who could have enabled more opportunities for him to visit with his children support[ed] the superior court's active efforts determination").

Enzo's bail condition forbade any contact with Archer, and pretrial detention resources at the jail were limited and less extensive than those offered for sentenced individuals. Thus, OCS could neither organize video calls or other contact with Archer, nor offer travel vouchers to access services. OCS could not do much to implement its case plans without resolving factors outside of its control, yet it did what it could within the confines of these logistical hurdles.

Although the case worker testified that much of the case planning was "contingent on [Enzo] not being in [jail]" and instead being in a facility with more robust services, the case plans included both immediately addressable concerns and future ones as well. For example, Enzo's second case plan required him to "[s]tay in contact with OCS" and "[a]ddress [his] no contact order," but also obligated OCS to "[a]rrange visitation when conditions allow." Enzo's situation was uniquely difficult and justified his plan in this case. The only additional goals OCS likely could have added would include "complete available pamphlets," and "attend parenting classes," but to his credit, Enzo already had undertaken this work.[23] Given the limits imposed by Enzo's incarceration in a pretrial facility with limited services and the strict conditions of his criminal case, there were few concrete steps realistically available for OCS to recommend to Enzo. OCS's case plan was adequate under the circumstances of Enzo's case.

---

[23] The fact that Enzo was engaging with services that were not part of his case plan does not cut against OCS's active efforts; indeed, his participation in these state-run services count as active efforts, regardless of whether OCS facilitated participation. *See T.F. v. State, Dep't. of Health & Soc. Servs.*, 26 P.3d 1089, 1096 (Alaska 2001) ("[B]ecause ICWA requires the State, rather than a particular agency, to make [']active efforts['] . . . we have held that the Department of Corrections . . . may fulfill this obligation by enrolling the parent in classes and treatment programs." (internal quotation marks omitted)).

**B.    OCS Made Active Efforts To Provide Services To Enzo.**

The lack of available services did not excuse OCS from its obligations to provide remedial services to Enzo, and OCS acted properly within the available options. Without citing any case law, Enzo argues that waiting until April 2024 to make referrals for services "would not amount to reasonable efforts, much less active efforts." Enzo seems to be taking issue with both the delay and the services themselves. But these arguments are not well taken.

First, initial delays do not necessarily render efforts less than active.[24] Moreover, OCS is not held to a standard of perfection.[25] Although OCS did not meet with Enzo in person immediately, that delay does not render its efforts insufficient under ICWA. OCS's well-advised hesitation about meeting with Enzo alone and many attempts to instead schedule a meeting through counsel excuse the initial delay. OCS eventually did meet with Enzo, and, later, with Enzo and his new attorney. In short, any initial delay in efforts does not mean that OCS failed to provide active efforts.

Second, regarding services, Enzo argues that OCS "could have helped [him] arrange counseling, or therapy, or parenting education, or substance abuse treatment," but that instead OCS caseworkers "simply waive[d] [sic] [their] hands and sa[id] that such programming [was] just not available in pretrial facilities." While Enzo is correct that failing to provide such services, if available, would have likely rendered OCS's efforts less than active, he does not point to any evidence in the record — nor

---

[24]    *Ronald H. v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 369-70 (Alaska 2021) (noting that court "cannot conclude that the shortcomings of OCS's investigation" including its "[d]elay [i]n [i]nvestigating" abuse allegations "negates its otherwise active efforts").

[25]    *O'Brien v. Delaplain*, 556 P.3d 1170, 1187 (Alaska 2024) ("Reunification efforts [under ICWA] must be tailored to the particular case but need not be perfect.").

does any seem to exist — that such services were accessible.[26] The unfortunate reality is that throughout the duration of Enzo's case, he was in jail and unable to participate in any remedial services and unable to have contact with Archer due to conditions in his criminal case. In light of these barriers, our independent judgment leads us to conclude that OCS's necessarily limited referrals nonetheless count toward active efforts.

### C. OCS Made Active Efforts To Place Archer With Family.

OCS's attempts to place Archer with extended family members count significantly toward active efforts. Enzo argues that other than meeting with him three times, giving him the numbers of service providers, and sharing periodic pictures of Archer, OCS did not support his reunification with Archer. Yet Enzo misses the impact of OCS's family placement efforts. When the circumstances of incarceration limit the efforts OCS can make, we give substantial weight to efforts to place the children with family.[27] In this case, OCS thoroughly considered placement options on both the maternal and paternal sides of Archer's family. Further, OCS spoke with three paternal relatives, all of whom were open to being placement options for Archer. Additionally, OCS arranged for visits with the child and Enzo's sister and investigated the possibility of placing Archer with his maternal grandmother.

---

[26] Enzo asserts that other pretrial detainees have obtained some level of programming or services. However, this claim is unsupported in the record. But even if pretrial detainees may have obtained some level of programming or services, it is unknown whether they were at the same facility as Enzo or faced the same parenting issues he did. Simply because a program may have been available at the jail does not mean that the program would have been relevant to Enzo.

[27] *Anton K. v. Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 554 P.3d 456, 472 (Alaska 2024).

OCS's persistent efforts to identify Archer's tribal affiliation also bear on active efforts.[28] Despite Archer's lack of formal tribal identification, the parties treated the case as if it were subject to ICWA. In line with this presumption, OCS reached out to several tribes to explore possible affiliation, developed a family tree, identified Archer's lineage sufficient for eligibility, prepared affiliation paperwork for both Enzo and Archer, and pursued participation by the identified tribe in this case. OCS eventually did secure documentation for Archer, though his application for membership was pending at the time of the termination trial. These commendable attempts to connect Archer with his tribe count toward active efforts.

### D. Considered In Their Entirety, OCS Made Active Efforts.

We conclude that when considered in their entirety and in these specific circumstances, OCS's efforts met ICWA's standard. Enzo's pretrial incarceration and conditions from his criminal case severely restricted the services available to him. Nevertheless, OCS diligently attempted to connect with Enzo, made referrals, and set present and future actions to take. OCS also made laudable efforts to identify Archer's tribe and enroll him in it. Combined with efforts to place Archer with extended family, OCS's work in this case met ICWA's standards for active efforts.

## V. CONCLUSION

The superior court's order is AFFIRMED.

---

[28] *See, e.g.*, *Walker E.*, 480 P.3d at 607 (suggesting that tribal contact can count toward "OCS . . . mak[ing] efforts" such as by "communicat[ing] with the [Father's] Tribe about [some of his] needs").