NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| VALE T., | ) |
| | ) Supreme Court No. S-17987 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-18-00360 CN |
| v. | ) |
| | ) MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) AND JUDGMENT[*] |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S SERVICES, | ) No. 1865 – December 15, 2021 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Kelly R. Taylor, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Borghesan, and Henderson, Justices. [Carney, Justice, not participating.]

## I. INTRODUCTION

An infant was taken into Office of Children's Services (OCS) custody

---

[*]     Entered under Alaska Appellate Rule 214.

shortly after birth. Over the next two and a half years his parents struggled with homelessness and substance abuse, and the child's father was repeatedly incarcerated. The superior court granted OCS's petition to terminate parental rights. The father appeals, arguing that OCS did not make active efforts required by the Indian Child Welfare Act (ICWA)[1] because OCS failed to: (1) adequately assist him in accessing services while he was incarcerated; and (2) meaningfully address his material needs for housing, reliable communications, and transportation. We are not persuaded by these arguments and therefore affirm the superior court's decision.

## II.    FACTS AND PROCEEDINGS

Vaughn T. was born on July 20, 2018 to Sheila S. and Vale T.[2] Vaughn is an Indian child as defined by ICWA.[3]

Two days after Vaughn's birth, OCS filed an emergency petition to gain temporary custody of Vaughn and adjudicate him a child in need of aid based on his parents' histories of substance abuse and criminal activity. At the time, Vaughn's father Vale was incarcerated for an assault conviction. Because OCS was unable to develop a safety plan or identify relatives to take Vaughn, the agency placed Vaughn in an emergency foster home.

---

[1]    25 U.S.C. §§ 1901-63 (2018). ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

[2]    We use pseudonyms for all family members to protect their privacy.

[3]    *See* 25 U.S.C. § 1904(f) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.").

Vaughn's initial assessment worker took Vaughn to visit Vale at the Cordova Center, an Anchorage halfway house, in July 2018. Vale spoke with the worker about his addiction issues and explained that he planned to access treatment services at the Anchorage Gospel Rescue Mission upon his release. The OCS worker did not refer Vale to additional services because she believed that Vale was engaging appropriately with services at the Cordova Center and that his plan to seek services at the Rescue Mission was appropriate. At a hearing on August 16, Vale's counsel explained that Vale was projected to be released at the end of the month and was motivated to pursue services after release.

In early September 2018, not long after being released from jail, Vale was arrested for assault and taken back into custody, where he would remain until early January 2019. A different OCS worker created a case plan for Vale. The case plan recommended that Vale undergo a substance abuse assessment and urinalysis testing after being released from custody. It also advised him to engage in educational opportunities related to substance abuse while incarcerated at Anchorage Correctional Complex. The OCS worker sent this case plan to Vale in jail along with monthly letters. OCS also assisted Vale with paternity testing while he was incarcerated, and in January the court granted OCS's motion to establish Vale's paternity and amend Vaughn's birth certificate accordingly.

After Vale's release from custody in January 2019, OCS prepared a new case plan for Vale. Vale and Sheila did not have a mailing address in Anchorage; they were homeless and lived in locations near the Sullivan Arena and the downtown soup kitchen. Vale's caseworker "tried numerous avenues" to locate the parents, including visiting the homeless camps and shelters where they were rumored to be living and leaving behind his card, calling the shelters to see if they had any information about their

whereabouts, and reaching out to workers, the tribe, and family members "to get a[n] understanding of where [the parents] might be." Vale's caseworker attempted to give them the case plan as well as bus passes when they did connect, but they left the case plan in the lobby. The caseworker was able to send them the case plan via Vale's email address.

OCS referred Vale and Sheila to Four Directions, a program providing wraparound services operated by Southcentral Foundation. The caseworker called Four Directions together with Sheila and Vale. This program required participants to have an individual conversation with treatment providers, and Vale and Sheila represented to the caseworker that they would schedule this conversation on their own. OCS sent collateral information about Sheila and Vale to Four Directions to help complete the picture. The caseworker testified that Sheila and Vale may have attended some classes with Four Directions but then stopped engaging when they decided to leave Anchorage for work.

In March 2019 Vale was assaulted by an unknown assailant and suffered a head injury. OCS referred Vale to a clinic to receive services for the injury. By May 2019 Vale told his caseworker that his brain injury was "doing better"; he "[didn't] feel good and [was] often dizzy" but was cleared to work part time.

Vale and Sheila moved to Whittier around May 2019. OCS referred Vale to a Whittier clinic that provided wraparound services, obtaining releases of information signed by both parents. OCS set up three-way calls with Vale and the provider in Whittier. In addition, Vale's caseworker again emailed Vale his case plan, which Vale confirmed he received. The caseworker described his contact with Vale during this time as "sporadic" and said that, when the caseworker left OCS in June 2019, Vale "had not done anything in regards to the case plan activities."

In June 2019 a third OCS caseworker was assigned to Vaughn's case. In

their first meeting, which took place over the phone, the caseworker went over Vale's case plan and emphasized the need to address substance abuse and take parenting classes. Vale replied that he was working with a substance abuse clinic in Whittier and taking medication that would help him stay sober. The caseworker did not call other treatment facilities that may have offered addiction services because Vale was "pretty adamant" he wanted to work with the Whittier clinic.

After the initial meeting, most of their contact revolved around Vale requesting visitation with Vaughn. During this time Vale would often call OCS on short notice to set up visitation with Vaughn because Vale had arranged a ride to Anchorage with his employer. The caseworker made efforts to accommodate these last-minute visits. In one instance, OCS provided Vale a hotel room in Anchorage so that he could attend a visit with Vaughn in early September 2019; Vale did not require transportation assistance for this visit because he had arranged a ride himself. The caseworker gave Vale the phone number of OCS's visitation supervisor and instructed him to set up a more regular visitation schedule, but there is no indication that Vale did so. The caseworker scheduled an in-person meeting with Vale, herself, and an ICWA worker in Whittier in September 2019.

However, this meeting did not happen because Vale was arrested in early September 2019 for assault and criminal mischief and remanded to custody. The next month OCS filed a petition to terminate parental rights.

The record contains very little information about what happened in Vale's case in the following months. The third caseworker testified that her contact with Vale was "very sporadic" but that when his phone was on, she would speak with him more than once per month. In early February 2020, Vale was seen at the Alaska Native Medical Center's emergency room for alcohol withdrawal. Later that month OCS

attempted to contact Vale through phone calls and text messages as well as through his attorney to create a new case plan together, but the outreach was not successful. The caseworker was not certain where Vale was living during this time; she believed that in February 2020 "he was incarcerated and between Anchorage and Whittier." When the caseworker was able to get Vale on the phone, he disagreed with her recommendation that he obtain a substance abuse assessment, insisting that he continued to work through the clinic in Whittier.

In May 2020 Vaughn's case was transferred to a fourth caseworker, who contacted Vale at Goose Creek Correctional Center in June to discuss Vale's progress with his case plan. Vale told the caseworker he did not want Vaughn to see him in jail and stated that he planned to access treatment when he left jail. Vale also told her that he did not want to contact providers with her because he would do so himself later.

The termination trial was held across four days in 2020: July 6, July 28, August 19, and October 8. Sheila did not attend any day of the trial. Despite saying he would attend the trial, Vale did not attend the first day. On July 11 Vale was arrested, although it is unclear if he was subsequently incarcerated. Vale was not at the second day of trial on July 28; his counsel reported that she had had no contact with him for weeks. On August 14 Vale was again arrested; he was incarcerated on the last day of trial on October 9. Vale attended the last day of the trial telephonically while in custody.

The superior court issued a decision on the record, finding that OCS had shown grounds for termination under AS 47.10.011(1) (abandonment) and (10) (substance abuse). Finding no dispute that Vaughn was a child in need of aid, that the parents had failed to remedy their conduct, or that custody of Vaughn by either parent would result in serious emotional or physical damage to Vaughn, the court focused on whether OCS met its active efforts burden.

The superior court rejected Vale's argument that OCS failed to make sufficient efforts when Vale was incarcerated, noting that Vale had been incarcerated for short periods of time, that some of his social workers had visited him in jail, that Vale had been aware of the services offered at the Cordova Center and had used some of them, and that at one point Vale chose not to engage in services while in custody. Referring to Vale's time out of custody, the superior court observed that "OCS can only do so much if a parent doesn't choose to engage, if a parent won't return phone calls, if a parent goes missing, keeps changing addresses, whatever it might be and refuses to engage."

The superior court also rejected Vale's argument that OCS had not adequately addressed his underlying problems stemming from poverty: "[t]heir poverty, their homelessness, their substance abuse was all addressed." The superior court specifically rejected Vale's argument that the "lack of a free phone . . . in any way contributed to . . . [Vale] not contacting OCS or any of the providers": it found "no evidence whatsoever that [Sheila] or [Vale] would have cured, remedied, . . . addressed any of the things on their case plan if they only had a phone." Having found that OCS made active efforts, the court terminated Vale and Sheila's parental rights. Vale appeals.

## III. DISCUSSION

"Before terminating parental rights to an Indian child, a court must find that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[4] Our case law distinguishes active and passive efforts:

---

[4] *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021) (quoting *Caitlyn E. v. State, Dep't of Health & Soc.* (continued...)

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts . . . [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.[5]

" '[N]o pat formula' exists for distinguishing between active and passive efforts," so we "conduct[] an active efforts inquiry on a case-by-case basis."[6]

"Whether the evidence in the record supports the superior court's active-efforts ruling is a mixed question of law and fact."[7] We review questions of law de novo,[8] and we review the superior court's factual findings for clear error.[9] A factual finding is clearly erroneous if our "review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[10]

To determine whether OCS met its active-efforts burden, we examine

---

[4] (...continued) *Servs., Off. of Child.'s Servs.*, 399 P.3d 646, 654 (Alaska 2017)).

[5] *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting CRAIG J. DORSAY, THE INDIAN CHILD WELFARE ACT AND LAWS AFFECTING INDIAN JUVENILES MANUAL 157-58 (1984)).

[6] *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013) (quoting *A.A.*, 982 P.2d at 261).

[7] *Ronald H.*, 490 P.3d at 365.

[8] *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 265 (Alaska 2019).

[9] *Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 788 (Alaska 2019).

[10] *Annette H.*, 450 P.3d at 265 (quoting *Claudio P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 860, 863 (Alaska 2013)).

"OCS's 'involvement in its entirety.' "[11] For example, we have found that the agency's failure to make active efforts in a seven-month period was "insignificant in light of the extensive remedial efforts . . . provided throughout its involvement" in the case over a period of years.[12] We also consider "a parent's demonstrated lack of willingness to participate in treatment" when determining whether OCS's efforts were sufficiently active.[13]

In the case at hand, OCS made considerable efforts to help Vale succeed. Soon after Vaughn was born, the initial OCS caseworker took him to Vale while he was incarcerated at the Cordova Center, where she learned Vale was already using some services and had a plan to go to the Rescue Mission on release — the same plan the caseworker would have suggested. The plan did not unfold as expected. Shortly after being released, Vale was arrested for assault and taken back into custody. At this point, Vale's new caseworker developed a case plan, sent it to Vale in jail, wrote Vale monthly letters, and assisted with paternity testing. Upon Vale's January 2019 release, the caseworker emailed and mailed Vale his case plan, and coordinated pickup of copies of the case plan along with bus tickets for Vale. He referred Vale to wraparound services with an Anchorage provider, sending the provider Vale's collateral information. When Vale declined to stick with this provider and moved to Whittier, OCS located a provider

---

[11]     *Dale H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 235 P.3d 203, 213 (Alaska 2010) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

[12]     *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002).

[13]     *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 528 (Alaska 2013) (quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1144 (Alaska 2010)).

that also offered wraparound services and set up a three-way call between himself, Vale, and the provider.  OCS procured a release of information from Vale and sent it to the provider.  Vale's third caseworker helped him to arrange visitation with Vaughn in Anchorage (sometimes at the last minute), reminded Vale of the need to engage in treatment for his addiction, and set up a trip to meet with Vale in person in Whittier.

However, this progress was interrupted when Vale was once again arrested and sent back to jail for a brief period of time.  After that, OCS had only "sporadic" contact with Vale and was unable to get him to participate in developing a new case plan.  When the third caseworker emphasized the need to get a substance abuse assessment, Vale disagreed.  By June 2020, he was in jail again for a short period of time.  Although his fourth caseworker contacted him there and offered to contact providers on his behalf, Vale declined this offer and said he would do it himself.  Vale was arrested twice more in the summer of 2020 and missed the majority of his termination trial.  As the superior court found, Vale made no progress in remedying his serious substance abuse problem.

Vale largely sidesteps the efforts OCS made while he was out of jail — and his unwillingness to engage with these efforts — and asserts that OCS's failure to do more during the periods he was incarcerated negates its efforts overall.  He also argues that OCS's efforts were insufficient because they did not address his "persistent, underlying problems" of poverty and housing instability.  We address each argument in turn.

A.    **OCS's Limited Efforts To Assist Vale While Incarcerated Do Not Negate Its Efforts Overall, Which Were Sufficiently Active.**

Vale argues that despite his being "in and out of state custody throughout this case," OCS workers "consistently failed to identify services with which [he] could engage while incarcerated."  He points to several instances of his caseworkers failing to

contact the facilities at which he was incarcerated, visit him during his incarceration, or make referrals upon his release. Vale argues that OCS workers "did not obtain information about what, if any, services" might be appropriate for him while incarcerated and "did not facilitate his engagement with any such services." Such "persistent failure" to assist Vale while he was incarcerated, he concludes, falls short of the active efforts required.

The record does not clearly indicate the precise periods of time when Vale was incarcerated, but a rough timeline can be discerned. He was incarcerated when Vaughn was born in July 2018 until sometime around the beginning of September. Vale was again arrested on September 8, 2018, and after his conviction was incarcerated until approximately early January 2019. On September 9, 2019, Vale was arrested and incarcerated at least through a September 26 hearing but was released by mid-October. Vale was incarcerated at certain points in February 2020, May 2020, and June 2020, although it is unclear for what or for how long. On July 11, 2020, Vale was again arrested; it is unclear if he was incarcerated. And on August 14, 2020, Vale was arrested; he was in custody on the last day of trial on October 9.

Such short, intermittent periods of incarceration made it difficult for anyone, including OCS caseworkers, to maintain communication with Vale or assist him in accessing services. For example, at the permanency hearing in September 2019, Vale's attorney said that she had only recently learned that Vale was in custody and had been leaving Vale messages in Whittier that he had not received. Vale's fourth OCS caseworker testified that she made multiple attempts to contact Vale while he was incarcerated, but faced numerous difficulties due to the Cordova Center's phone system. And on the third day of the termination hearing, Vale's attorney stated that she had been informed Vale was in custody but was told he was unavailable upon calling the

Anchorage jail. It understandably took OCS caseworkers some time to learn that Vale, who had "very sporadic" and "inconsistent" contact with the agency, was incarcerated, let alone to visit him and connect him to services in the places he was detained.

"The scope of the active efforts requirement [is] necessarily narrowed by the[] 'practical reali[ties]' " borne of the "logistical challenges of . . . incarceration," including difficulty with email and phone systems.[14] Vale's case is a prime example of this reality, and OCS's efforts must be evaluated within the context of his frequent movement in and out of incarceration, along with the relatively short length of his stays.[15] Repeatedly entering and exiting custody not only made it challenging for OCS to assist Vale in accessing services available while incarcerated (which are limited to begin with) but also reduced the chance that his participation in those services would be sustained enough to yield meaningful results.

Broadly speaking, Vale challenges his caseworkers' failure to visit him or make referrals on his behalf while he was incarcerated. But one of Vale's four caseworkers did visit him while he was incarcerated; another contacted him while he was at Goose Creek; and a third regularly wrote him letters while he was in jail from September 2018 to January 2019.

As for referrals, it was appropriate for Vale's first caseworker to endorse Vale's own plan to seek services at the Rescue Mission, which she testified that OCS

---

[14] *Jude M. v. State*, *Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 556 (Alaska 2017) (third alteration in original) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)).

[15] The guardian ad litem suggests that the four month period between September 2018 and January 2019 was the longest uninterrupted period Vale was in jail throughout this case. On the record before us, this appears correct, although there is some uncertainty about Vale's incarceration in the first half of 2020.

would have recommended anyway. OCS need not provide a host of services to a parent who has already identified an appropriate treatment plan; rather, OCS can and should support the parent's initiative and leverage the parent's ownership of the rehabilitative process. When the second caseworker took over, he did not make a referral or recommend additional services because he was told by the initial caseworker that Vale was "due to receive actual housing and job services." He thus believed Vale already had a workable plan. When that plan did not succeed because Vale committed an assault and went back to jail, the caseworker created a new case plan, sent it to Vale in jail, and wrote Vale monthly letters.

For the most part, Vale's remaining stints in jail were so brief that there was not much OCS could meaningfully do to help him access rehabilitative services in custody. Vale was incarcerated for roughly a month following a September 9, 2019 assault arrest. He spent some time in custody in February, May, and June 2020, although it is unclear for what or for how long. And when Vale's fourth OCS caseworker contacted Vale in jail in June 2020, Vale told her that he did not want Vaughn to see him in jail, and he explained he was planning on receiving treatment when he left jail.[16] She testified that Vale "had intentions to engage in services when he got out of jail" and that

---

[16] The superior court found that two OCS workers visited Vale while he was incarcerated, and that Vale "informed OCS that he was aware of the programs that were offered by DOC and Cordova Center; that he did not wish to participate in them; that he would wait until he got out . . . ." Parts of this finding are clearly erroneous. The record does not support a finding that the two workers visited Vale in jail. And the only support for the finding that Vale declined services in jail is his fourth caseworker's testimony regarding June 2020. To the contrary, the initial caseworker's testimony indicated that Vale was using some services while at Cordova House shortly after Vaughan was born, and there is no testimony suggesting Vale declined services while incarcerated in the fall of 2018. We do not rely on the erroneous portions of this finding in concluding that the efforts OCS made over the course of Vale's case were sufficiently active.

she "[didn't] believe he was choosing to engage or look at services while he was there." And after Vale was incarcerated again for a longer period beginning in August 2020, his caseworker spoke with Vale about available services at the Cordova Center.

The only time when OCS might realistically have done more to help Vale while in jail was during the fall of 2018, when he spent between three and four months at the Anchorage Correctional Complex. Although his OCS worker at the time sent him a case plan, wrote letters, and assisted with paternity testing, the worker also could have identified for Vale specific services offered in jail. Yet given the extensive efforts this worker made immediately following Vale's release in January 2019, along with OCS's efforts during the life of the case and Vale's own failure to engage, we conclude that this shortcoming does not negate OCS's efforts overall.

Vale's case is not comparable to the cases he cites in his briefing. In *Clark J.* the father, like Vale, was incarcerated for only short periods of time during the life of the case.[17] But OCS made scant efforts for the final two years of Clark's case, failing to provide him an updated case plan, search for him while incarcerated, visit him while in jail, refer him to treatment while in custody or upon release, or schedule in-person visits with his children.[18] By contrast, the OCS workers in Vale's case did visit and contact him in jail, did update his case plans, did refer him to multiple treatment providers upon his release from jail, and did work to arrange visits with his child at the last minute (and referred him to the OCS visitation supervisor to set up regular visitation, which he did not do). In *Duke S.* we ruled that OCS failed to make reasonable efforts to assist an incarcerated parent when OCS did not even make a case plan for the parent and met with

---

[17]    *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 899 (Alaska 2021).

[18]    *Id.* at 903.

him only once in 17 months.[19] OCS workers did far more to assist Vale in this case. We conclude that OCS's efforts were sufficiently active in this case and that any shortcomings during Vale's brief and intermittent periods of incarceration did not negate those efforts.

**B.    OCS's Efforts To Address Vale's Underlying Problems Were Sufficiently Active.**

Vale next argues that OCS made only "passive" efforts regarding his "persistent, underlying problems" related to poverty, including lack of stable housing, reliable means of communication, reliable transportation, and Vale's traumatic brain injury. We address each point in turn and conclude that OCS's efforts on each front were sufficiently active to satisfy its overall active efforts burden.[20]

**1.    Housing**

Vale first argues that OCS failed to address his housing instability. Yet OCS referred Vale to Cook Inlet Tribal Council, which appointed a case manager to assist Vale in accessing housing and employment. Vale did not use these services.

Moreover, "OCS has discretion to prioritize which services should be provided to a parent based upon the issues identified in [the parent's] case."[21] OCS's

---

[19]    *Duke S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1127, 1133-34, 1136-37 (Alaska 2018).

[20]    Vale also argues that his third caseworker failed to mail him a release of information that would have allowed her to confirm Vale was working with the clinic in Whittier in the summer of 2019. Although true that she could have done so, this omission does not negate OCS's overall efforts given Vale's own passivity and inability to stay in contact with OCS.

[21]    *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1071 n.25 (Alaska 2018) (rejecting argument that OCS failed to address

(continued...)

efforts were geared in significant part toward addressing Vale's substance abuse, which he disclosed was an issue in his first meeting with a caseworker in July 2018. OCS could properly decide that sobriety, rather than housing, was the linchpin of Vale's success. As the guardian ad litem points out, Vale was able to independently secure housing and employment in Whittier, although it appears that by February 2020 he was engaged in substance abuse and may have lost his job and housing after being incarcerated that spring. The services OCS offered to Vale — which focused on addiction but provided some assistance with housing — were an appropriate exercise of its discretion in light of the facts of Vale's case.

### 2. Communication

Vale next argues that OCS failed to remedy his lack of a reliable means of communication with his caseworkers and suggests that OCS should have purchased a phone plan for him. The superior court found that better access to a phone would not have improved the parents' communication with OCS. This finding is not clearly erroneous. Vale's second caseworker testified that Vale had multiple phone numbers for OCS that he used when he needed to get in contact, although he described such contact as "very infrequent[]." He also communicated with Vale by email and text message. Another caseworker testified that when Vale's phone was on they would be in touch regularly, that he would often contact her requesting visitation, and that Vale would call and leave messages on both her office and cell phone. Because the superior court's finding that the lack of an OCS-funded phone plan did not "in any way contribute[] to . . . [Vale] not contacting OCS or any of the providers" is not clearly erroneous, we reject Vale's argument that OCS was required to purchase a phone plan for him in order to

---

[21]     (...continued)
the mother's "poverty, homelessness, or unemployment").

provide active efforts in his case.

### 3. Transportation

Vale contends he lacked a reliable means of transportation to Anchorage when he was living in Whittier, frustrating his ability to regularly visit Vaughn. Vale's third caseworker testified that Vale's transportation was not a problem because "a lot of times he would ride in [from Whittier] with [his] employer." On at least one occasion that Vale traveled to Anchorage, OCS paid for his hotel room. Receiving rides from his employer meant Vale did not have much advance notice, which could make scheduling visits difficult. OCS workers "tried to accommodate when [Vale] would be in town to set up visits on short notice." To rectify this issue, the caseworker asked Vale to work with an OCS supervisor to set up a more regular visitation plan, but Vale never did so.

Overall, the record shows that OCS "worked hard to make [visitation] happen," even with little notice, and Vale failed to develop a more regular visitation plan that would likely have come with OCS transportation assistance if Vale needed it. These facts do not undermine a finding of active efforts.

### 4. Head injury

Finally, Vale argues that OCS was passive with respect to the head injury he suffered in March 2019. In particular, he points out that his second caseworker did not remember asking — and his third caseworker did not ask — for a release of information to talk to Vale's medical provider about the extent of the injury. Nevertheless, OCS accommodated the injury by referring Vale to a medical clinic for his injuries, and Vale later informed his caseworker that he was engaged with all required services and medical appointments. The caseworker also reported that although Vale "doesn't feel good and is often dizzy," he was cleared to do part-time work. There is no indication that Vale ever informed OCS that the head injury was interfering with his

ability to work his case plan or be a good parent.  OCS's efforts to assist Vale with his injury were sufficiently active.

## IV.    CONCLUSION

We AFFIRM the judgment of the superior court.