*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HERNANDEZ/HODGE/BENSON, Minors.

UNPUBLISHED
October 07, 2024
11:02 AM

No. 369713
Cass Circuit Court
Family Division
LC No. 22-000043-NA

Before: SWARTZLE, P.J., and REDFORD and FEENEY, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to her minor children, MH, AH, and AB under MCL 712A.19b(3)(c)(*i*) (failure to rectify the conditions that led to the adjudication) and (j) (reasonable likelihood that children will be harmed if returned to parent).[1] MH and AH are enrolled members and AB is eligible for membership in the Pokagon Band of Potawatomi Tribe. As a result, this case involves the application of the Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq.*, and the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq.*

On appeal, respondent argues that the trial court erred when it found that the children would suffer serious emotional or physical damage if returned to her care, erred when it found that the Department of Health and Human Services ("DHHS") made active efforts to reunify her with her children, and abused its discretion when it suspended her parenting-time visits without making the required findings. Because we conclude that respondent has not identified any errors that warrant relief, we affirm.

## I. FACTUAL BACKGROUND

The DHHS became involved with the children after respondent gave birth to AB at home in March 2022. Respondent stated that she did not know that she was pregnant before she gave

---

[1] The respondent-fathers of MH, AH, and AB are not parties to this appeal. Accordingly, we refer to respondent-mother as "respondent."

birth. Emergency responders took AB to the hospital where she was treated for various conditions. AB later tested positive for amphetamine and methamphetamine. The DHHS learned that respondent had two other minor children, MH and AH, who were living with respondent's mother. The DHHS petitioned the trial court to take jurisdiction over the children in April 2022.

Because respondent, MH, and AH were enrolled members of the Pokagon Band of Potawatomi Tribe, the DHHS cooperated extensively and consistently with tribal authorities during this case. The DHHS learned that the tribe had opened a case involving respondent in 2021. The tribe investigated allegations that respondent was involved in substance abuse and prioritized men over her children. The tribe closed the case without substantiating it after respondent voluntarily placed MH and AH with her sister.

The DHHS and tribe working together tried to provide respondent with various services to address her substance-abuse problems, mental-health issues, and other barriers. Respondent, however, repeatedly failed to participate in the services. Respondent failed to complete a psychological evaluation despite being scheduled for eight evaluation appointments. She missed the majority of her parenting-time visits. She missed most drug screens and when she tested, she tested positive for amphetamine and methamphetamine. There was evidence that respondent attended parenting-time visits under the influence of alcohol and methamphetamine.

As a result of missed parenting-time visits, which caused stress for the children, and concerns about respondent's condition and behavior during parenting-time visits, the DHHS moved to suspend respondent's parenting time in August 2022. By that time, respondent had missed several attempts by the DHHS to get her to submit to a psychological evaluation with Dr. Randall E. Haugen. The DHHS asked the trial court to suspend respondent's parenting-time visits until respondent completed the evaluation with Dr. Haugen. It opined that the parenting visits should then resume only to the extent that Dr. Haugen recommended. The trial court agreed and suspended respondent's parenting time in December 2022.

Respondent continued to be offered services from both the DHHS and the tribe throughout the first nine months of 2023. Respondent tested positive for methamphetamine and amphetamine throughout that time. By September 2023, the trial court ordered a concurrent plan of adoption and reunification because respondent had not been willing to participate in services. In October 2023, the DHHS petitioned to terminate respondent's parental rights to the three children under MCL 712A.19b(3)(c)(*i*), (g), and (j).

In November 2023, respondent finally agreed to participate in a two-week long stay at an inpatient drug-treatment facility. Respondent also started regularly attending counseling sessions and meetings to address her substance abuse. However, respondent relapsed and tested positive for THC, methamphetamine, and amphetamine in January 2024.

The trial court terminated respondent's parental rights under MCL 712A.19b(3)(c)(*i*) and (j) at a termination hearing held over two days in December 2023 and February 2024. At the close of the hearing, the trial court recognized that respondent had finally begun to take steps to deal with her substance-use disorder, but the court also noted that the children had been removed 671 days before the last day of the hearing. The trial court stated that—although respondent thought

that she would be ready to reunify in a month—it would probably take longer than that because she needed to be stable.

The trial court found that respondent had not demonstrated enough stability to show that the barriers to reunification had been rectified. The key finding was that respondent failed to fully engage in services and did not reduce or eliminate the barriers that brought the children into care. The court also found that the DHHS had met its obligation to provide active efforts to reunify the Indian family and found beyond a reasonable doubt that continued custody by respondent would cause serious emotional or physical harm to the children. Finally, the trial court found that termination of respondent's parental rights would be in the children's best interests. The court found that the children needed permanency and stability—they needed this stage to be behind them. Accordingly, in February 2024, the trial court ordered the parental rights of respondent to all three children to be terminated and ordered that no further efforts be made to reunify the children with respondent. This appeal followed.

## II. SERIOUS EMOTIONAL OR PHYSICAL DAMAGE

Respondent first argues that the trial court clearly erred when it found beyond a reasonable doubt that the children would likely suffer serious emotional or physical damage if returned to her care. Concluding that sufficient record evidence supported the trial court's determination that the children would suffer serious emotional damage beyond a reasonable doubt, we disagree.

This Court reviews de novo whether the trial court properly interpreted and applied the applicable statutes and court rules. *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019). This Court reviews a trial court's findings for clear error. *In re Rood*, 483 Mich 73, 90; 763 NW2d 587 (2009). A finding is clearly erroneous when, after reviewing the entire record, this Court is left with the definite and firm conviction that the trial court was mistaken. *Id*. at 91.

"The ICWA and the MIFPA each establish various substantive and procedural protections for when an Indian child is involved in a child protective proceeding." *In re England*, 314 Mich App 245, 251; 887 NW2d 10 (2016). The ICWA provides that a state may not terminate the parental rights of a parent or custodian of an Indian child unless the court finds beyond a reasonable doubt that the parent's or custodian's continued custody of the child "is likely to result in serious emotional or physical damage to the child." 25 USC 1912(f). The MIFPA incorporates the same requirement with an additional requirement that the finding beyond a reasonable doubt be supported by the testimony of at least one expert who qualifies as an expert under MCL 712B.17(1). See MCL 712B.15(4); see also MCR 3.977(G)(2). Under MCL 712B.17(1), if a qualified expert is required in a termination proceeding involving an Indian child, then the trial court must accept as an expert—in relevant part—a "member of the Indian child's tribe, or witness approved by the Indian child's tribe, who is recognized by the tribal community as knowledgeable in tribal customs and how the tribal customs pertain to family organization and child rearing practices."

In this case, Kimberly Cushway was approved by the Pokagon Band of Potawatomi Indians to offer expert testimony on the tribe's customs involving family organization and child rearing. Specifically, Cushway testified at the December 2023 termination hearing that substance abuse was not consistent with the tribe's customs, and she opined that—if the DHHS proved the

allegations stated in the petition to terminate—the children would be in danger of serious emotional or physical damage if returned to respondent's care. Accordingly, the trial court made properly supported findings as required by 25 USC 1912(f), MCL 712B.15(4), and MCR 3.977(G)(2).

On appeal, respondent contends that the trial court's finding beyond a reasonable doubt that the children would be emotionally or physically damaged was unsupported by an expert as required under MCL 712B.17(1) because the expert testimony provided by Cushway only addressed respondent's conduct through the December 2023 hearing. She did not provide updated testimony at the February 2024 hearing that would have reflected that respondent started to make progress on her substance abuse. We disagree.

Michigan's Legislature does not require a trial court to base its finding beyond a reasonable doubt solely on a qualified expert's opinion; the Legislature requires that the determination be supported by testimony of a qualified expert:

> No termination of parental rights may be ordered in a proceeding described in this section without a determination, *supported by* evidence beyond a reasonable doubt, including testimony of at least 1 qualified expert witness as described in [MCL 712B.17], that the continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the Indian child. [MCL 712B.15(4) (emphasis added).]

Cushway was a qualified expert and her testimony supported the trial court's finding. Nothing more was required by the statute. Respondent's complaints about Cushway's testimony go to the weight and credibility of her testimony. See *Surman v Surman*, 277 Mich App 287, 309-310; 745 NW2d 802 (2007) (stating that an expert's flaws are a matter of weight and credibility).

Cushway's testimony was also not deprived of all probative value as a result of her failure to more fully address respondent's then recent change of heart about her abuse of methamphetamine.[2] Cushway formed her opinion on the basis of documents and meetings with the tribe's social services department and attorneys that included updates about respondent's case. Cushway stated that her concerns about respondent arose from her lack of participation or trying, and her substance abuse. She stated that a parent could not care for a child while under the influence of substances. She opined that respondent demonstrated that she did not take her substance-abuse problems seriously by failing to participate in any of the programs offered to her.

Respondent also ignores that Cushway testified after respondent enrolled in an inpatient treatment plan in November 2023. Given that she completed an inpatient stay when Cushway testified in December, nothing prevented respondent's lawyer from raising that evidence with Cushway and cross-examining her about her opinion on the basis of that evidence. Likewise, nothing prevented respondent from recalling Cushway at the second day of the termination hearing

---

[2] And despite respondent's engagement in services immediately before the termination hearings began, respondent tested positive for methamphetamines in January 2024—between the first and second days of the termination trial.

and asking her how her opinion might be affected by the indications that respondent started to make progress. Regardless, the trial court heard testimony about respondent's more recent efforts at sobriety, which included a relapse on January 23, 2024, and could evaluate Cushway's testimony in light of that evidence. Accordingly, any deficiencies in Cushway's testimony did not establish that the trial court's finding beyond a reasonable doubt that the children would be seriously emotionally or physically damaged if returned to respondent's care was clearly erroneous.

Respondent's argument that there was insufficient evidence to support the trial court's finding also lacks merit. There was compelling evidence that respondent's substance abuse and poor parenting had already harmed her children and that there was an unacceptable risk that she would continue to make poor decisions that would cause serious emotional if not physical damage to the children.

Dr. Haugen's report and testimony about MH permitted an inference that MH had been neglected and subjected to trauma while under respondent's care. Dr. Haugen explained that MH was prone to mood swings, angry outbursts, and impulsive behavior, which was consistent with having grown up in an unstable environment with confused relationships. MH experienced a lot of inner turmoil, a compromised ability to attach to adults, and suffered from feelings of unhappiness, depression, and sadness. She engaged in self-harm and threatened others. MH witnessed aggression while living with respondent. Dr. Haugen opined that MH needed stability in her life from consistent caregivers who understood her needs. Dr. Haugen's testimony, when considered in light of the other evidence, supported that respondent's drug addiction and poor parenting had already harmed MH, and that continued relapses and poor parenting decisions by respondent would cause additional serious emotional damage to her.

There was similar evidence for AH and AB. AH's counselor testified that she was helping AH with identifying and expressing emotions, with understanding her placement changes, and processing the trauma that she had experienced as a result of the situation created by respondent's abuse of methamphetamine. AB, in addition to having been exposed to methamphetamine in utero, had attachment issues—she would resist nurturing behaviors, and it was only with therapy that she came to accept comforting and soothing behaviors from caregivers. She also had fairly significant language and gross-motor delays.

In addition to the evidence that respondent had already emotionally harmed her children, there was evidence that respondent had not changed her behavior and would likely continue to neglect and harm her children if they were returned to her care. Record evidence supported that respondent had a severe methamphetamine addiction that predated the children's removal. Indeed, this case began because respondent gave birth to AB in her home and both respondent and AB tested positive for methamphetamine. The evidence established that respondent had not reached a level of sobriety that would allow her to effectively and safely parent the children, and that she would be unable to do so within a reasonable time given the young ages of these children. The DHHS repeatedly tried to get respondent to participate in intensive inpatient therapies and other services, but respondent failed to engage in those services for more than 18 months.

There was testimony that all three children needed stability and permanence from caregivers who could meet their specific needs. The evidence showed that respondent did not have

the parenting skills to meet their needs and that her drug addiction continued to endanger the children. The evidence that respondent refused to extend her stay at Sacred Heart, even though she was apparently approved for an additional two-week stay, and the evidence that she relapsed in January 2024, permitted an inference that respondent had not committed to sobriety, which made it likely that she would experience further relapses. On the record before the trial court, the court did not clearly err when it found that respondent's belated effort to get sober was insufficient to establish that respondent would be able to safely parent the children within a reasonable time. See *In re Rood*, 483 Mich at 90. The trial court did not clearly err when it found that the children would likely suffer serious emotional or physical damage if returned to respondent's care under the circumstances still present at the time of the termination hearing. See *id*.

Respondent suggests that the deficiencies that she identified in the record as to the trial court's finding beyond a reasonable doubt that the children would suffer serious emotional or physical damage if returned to her care also demonstrate that the trial court clearly erred when it found that the DHHS proved a ground for termination. We disagree.

The trial court found that the DHHS established grounds for terminating respondent's parental rights under MCL 712A.19b(3)(c)(*i*) and (3)(j). Termination is proper under MCL 712A.19b(3)(c)(*i*) when the trial court finds by clear and convincing evidence that a parent was a "respondent . . . , 182 or more days have elapsed since the issuance of an initial dispositional order," and the "conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." Termination is appropriate under MCL 712A.19b(3)(j) if there is "a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent."

There was no dispute that the DHHS had been trying to get respondent to participate in services designed to rectify the conditions that led to the adjudication and that more than 182 days had elapsed since the initial dispositional order. The evidence further showed that respondent had only recently tried to become sober and did not fully commit to that sobriety. Respondent refused to extend her stay at Sacred Heart even though she was apparently approved for an additional 14-day stay and then relapsed in January 2024.

Respondent obtained an e-mail from her counselor at Sacred Heart lauding her successes since entering counseling in December 2023. The counselor felt that respondent's prognosis was good because she had been able to improve her relapse prevention skills. The e-mail, however, was sent after respondent had relapsed. Respondent testified that she did not inform her counselor about her relapse. She further consistently tested positive for THC and stated that she needed to use marijuana to help with anxiety and enable her to cope. Respondent's decision to shorten her stay at Sacred Heart, her dependency on marijuana to help her mood, and her relapse on methamphetamine because the day of the month corresponded to the day of the month in which her youngest child was born suggested that she did not fully appreciate the efforts that it would take to lead a sober life. Examining the evidence as a whole, the trial court could find beyond a reasonable doubt that the conditions that led to the adjudication continued to exist and that there was no reasonable likelihood that the conditions would be rectified within a reasonable time given the children's ages and trauma histories . Therefore, the trial court did not clearly err when it found that termination was proper under MCL 712A.19b(3)(c)(*i*). See *In re Rood*, 483 Mich at 90.

-6-

Although a trial court need only find one statutory ground to support termination, *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011), termination was likewise warranted under MCL 712A.19b(3)(j). The evidence showed that respondent had not made sufficient progress on sobriety to ensure that she would be able to safely parent the children. Respondent's record of neglecting the children's needs while using methamphetamine and the evidence that her neglect emotionally and physically harmed the children was sufficient to support a finding that the DHHS established grounds for termination under MCL 712A.19b(3)(j) by clear and convincing evidence. See *In re Rood*, 483 Mich at 90.[3]

## III. ACTIVE EFFORTS

Respondent next argues that the trial court erred when it determined that the DHHS satisfied its duty to make active efforts to reunify her with her children. We disagree.

To the extent that respondent argues that the trial court's findings underlying its decision were clearly erroneous, she did not have to take any special steps to preserve that claim of error. See *In re Beers*, 325 Mich App 653, 677; 926 NW2d 832 (2018). However, respondent did not preserve her arguments that the DHHS should have provided her specific services and that the DHHS did not accommodate what she asserts on appeal was a disability in compliance with the Americans with Disabilities Act (ADA), 42 USC 12132 *et seq.* See *In re Atchley*, 341 Mich App 332, 336; 990 NW2d 685 (2022) (explaining that a parent must challenge the adequacy of the services when the court adopts the case service plan or at some appropriate point during the lower court proceeding); *In re Terry*, 240 Mich App 14, 26 n 5; 610 NW2d 563 (2000) (explaining that parent must challenge the DHHS's accommodation of a disability when the court adopts the service plan or at some point during the lower court proceedings). We review unpreserved claims of error in a termination of parental rights case for plain, outcome-determinative error. See *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008); see also *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW3d ____ (2023) (Docket No. 359090); slip op at 5 n 3. A plain, outcome-determinative error will only warrant relief if the error affected the fairness, integrity, or public reputation of the proceeding. *In re Utrera*, 281 Mich App at 9.

Except in certain special cases, see MCL 712A.19a(2), the DHHS must make reasonable efforts to reunify the family before petitioning to terminate a parent's parental rights, *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017). When Indian children are involved, the DHHS must provide more than just reasonable efforts to reunify the family, it must provide active efforts to reunify it. See 25 USC 1912(d); MCL 712B.15(3); MCR 3.002(1). " '[A]ctive efforts' are defined as 'actions to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and to reunify the Indian child with the Indian family.' " *In re Beers*, 325 Mich App at 680, quoting MCL 712B.3(a). Such efforts require more than merely drawing up a case service plan and then leaving the parent to develop her own resources and bring

---

[3] Respondent has not challenged the trial court's finding that termination of her parental rights to the children was in their best interests. As such, we may presume that the trial court did not clearly err by finding that termination was in the children's best interests. See *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo*, 462 Mich 341; 612 NW2d 407 (2000). Regardless, the record also supported that finding.

it to fruition. The DHHS must take the parent through the steps of the plan and assist her in developing the skills necessary to retain custody of her children. *In re JL*, 483 Mich 300, 321; 770 NW2d 853 (2009); see also MCR 3.002(1)(a) through (*l*) (listing examples of active efforts). The DHHS also has an obligation to be culturally sensitive in the provision of active efforts. Indeed, it should use available resources from the parent's extended family, the tribe, Indian social services, and individual Indian caregivers. *In re JL*, 483 Mich at 322-323.

The parent has a commensurate duty to participate in the services and must demonstrate that she benefited from the services. See *In re Atchley*, 341 Mich App at 339. When challenging whether the DHHS made adequate accommodations, the parent has the burden to show that she would have fared better with the suggested accommodations. See *In re Fried*, 266 Mich App 535, 543; 702 NW2d 192 (2005).

In this case, the record reflects the DHHS provided active efforts to help respondent overcome the barriers to being reunified with her children. As the trial court repeatedly found, the DHHS provided numerous services to respondent and her children:

> They're have been numerous active efforts in this case that include CPS [Children's Protective Services] investigation, law enforcement investigation, interview, CPS case management, forensic interview of the child through the [Children's Advocacy Center], individual therapy, wrap-around, safety planning, (inaudible) fit, mental health services, supervised parenting time, relative placement, case management, [Children's Trauma Assessment Center], church youth group service, academic services, [Michigan Youth Opportunities Initiative], driver's training, mental health assessment, referral, substance abuse assessment referral, random drug screens, family team meetings, Hayland counseling center, Pokagon Band Behavioral Health Care Service, Pokagon Band of Social Services, and Sacred Heart substance abuse services.

On appeal, respondent does not seriously contest that the DHHS provided these services and does not challenge whether they amounted to active efforts. Instead, she argues that the evidence that she eventually entered a treatment program showed that the DHHS did not try hard enough at the earlier stages to address her drug problem and enabled her failure to participate. The record does not support her argument. Instead, the record showed that respondent's unwillingness to participate in drug-treatment services was the driving factor behind her failure to overcome the barriers to reunification.

The DHHS early and often tried to get respondent into drug-treatment programs. The DHHS referred respondent to Family Treatment Court, and set up multiple meetings for respondent regarding Family Treatment Court. Despite telling the tribal court that Family Treatment Court was precisely the service she wanted, respondent chose not to use it. The DHHS also referred respondent to Carol's Hope inpatient treatment. Respondent informed the DHHS that she did not qualify for the program despite her serious drug problem. Foster-care worker, Tina Johnson, contacted Haven and the Family Treatment Court on respondent's behalf, and a tribal representative also tried to get respondent into an inpatient treatment program early in the proceedings. The evidence showed that respondent, for whatever reason, refused to participate in

any of the intensive inpatient programs that the DHHS offered to her. She also failed to show for other substance-abuse and mental-health referrals.

Respondent faults her first counselor, Longenecker, for failing to confront respondent about her drug abuse and for failing to cajole respondent into participating in substance-abuse treatment, but the record shows that respondent failed to engage with Longenecker and outright denied that she had a drug problem. Longenecker testified that she tried to treat respondent from August 2022 to March 2023, but respondent only attended about half of her telehealth appointments. Even then, she was often tardy. Although the sessions were supposed to be 45 to 50 minutes, some lasted only 15 minutes. Longenecker tried to discuss respondent's substance-abuse problem with respondent, but she could not address it because respondent refused to acknowledge that she had a problem. Longenecker stated that, overall, the few sessions that she had with respondent were unproductive. Longenecker was forced to cancel the service for lack of participation.

The infant-mental-health specialist who worked with AB, Heather DeCastro, similarly tried to provide respondent with services to help her understand AB's needs beginning in February 2023, but respondent again missed numerous appointments through September 2023. DeCastro testified that respondent had admitted struggles with alcohol and marijuana, but respondent denied using "hard drugs" at that time. Respondent only later admitted that she had been using methamphetamine. DeCastro told her that she might benefit from a sober-living home or inpatient rehabilitation facility.

DeCastro's testimony did not establish that Longenecker did not try hard enough to get respondent to acknowledge her substance-abuse problem. Rather, DeCastro's testimony showed that respondent continued to deny having a serious drug-abuse problem after Longenecker discontinued her service. Even after respondent finally acknowledged that she was abusing methamphetamine, respondent continued to miss appointments and failed to engage with services, such that DeCastro stopped working with respondent in August 2023. DeCastro nevertheless allowed respondent to schedule appointments in September 2023, but respondent again failed to show for those appointments. DeCastro's testimony was consistent with testimony by another therapist, Yerling Ruedinger-Quispe, who tried to counsel respondent beginning in August 2023. She closed respondent's case when respondent only participated in one full session. Accordingly, DeCastro's and Ruedinger-Quispe's testimony permitted an inference that respondent was still unable to admit her problems and commit to the services being offered by the DHHS as late as September 2023, which was approximately 18 months after the DHHS first petitioned for the children's removal from respondent's care.

On appeal, respondent cites a summary of services by Carla Lowe as evidence that she would have benefited earlier had the DHHS's staff been more aggressive with her about her substance abuse during the earlier stages of the proceedings. Lowe's summary of her services does not support respondent's position. Lowe was a parent educator assigned to respondent to help her learn to parent in a therapeutically appropriate manner, which included getting respondent to understand the impact substance abuse had on her children. Lowe's summary showed that Lowe encountered the same problems that every other service provider had encountered with respondent: respondent refused to admit that she had a problem and failed to participate meaningfully in the services, which were ultimately discontinued for lack of participation. Lowe's summary also does

not permit an inference that Lowe's aggressive counseling led to results whereas previous counseling failed. To the contrary, Lowe's summary showed that she too could not get respondent to engage in services in 2022, despite Lowe counseling that respondent needed inpatient services in 2022. Even as late as September 2023, respondent was denying her problem with methamphetamine and blaming the DHHS. Lowe's summary, when considered with the other evidence, permitted an inference that the only thing that caused respondent to engage in services in November 2023 was the imminent termination of her parental rights. As the trial court correctly found, that decision came too late, and respondent made too little progress to be able to provide permanency and stability for her children within a reasonable time.

Respondent frequently offered excuses to the DHHS's service providers for her missed meetings and appointments, such as problems with her cell phone and transportation issues, but there was testimony that the DHHS actively tried to rectify those problems. The DHHS offered her a cell phone and help with transportation, placed respondent on a call system, and provided her with alternate contacts. Respondent also admitted that she missed both in-person and telecommunication appointments because she forgot about them or overslept. Accordingly, the record demonstrates that the DHHS made active efforts to provide respondent with services and to ensure that she could participate in those services.

Respondent also asserts that, if she had not had her parenting time suspended, then she would have engaged with the services. That contention is also unsupported by the record. Indeed, the DHHS offered an inpatient treatment program that eventually would have included housing respondent with her children, but respondent failed to participate in that service as well.

Respondent complains on appeal that the DHHS did not adequately recognize that she had other significant mental-health problems—such as possible postpartum depression—that had to be addressed for her to make progress. She again faults Longenecker for failing to address these issues. The DHHS made continuous efforts to get respondent to participate in a psychological evaluation. This evaluation would have provided the baseline information needed for the DHHS and its service providers to connect respondent with appropriate mental-health services. Despite the DHHS and tribe offering respondent assistance to attend scheduled evaluation dates, respondent failed to show up for eight different evaluation appointments and failed to undergo the mental-health assessment to which the DHHS referred her. The failure to attend these appointments demonstrated that respondent was unwilling to take even minimal steps to engage with the DHHS's efforts.

Respondent also suggests that the DHHS should have offered more intense case management, such as providing in-person meetings every week. However, respondent never informed the DHHS or the trial court that she needed in-person meetings, and the evidence showed that Johnson tried to accommodate respondent's needs in any way that she could, but respondent failed to follow up on any suggestions. Respondent also asserts, without any analysis, that the DHHS did not comply with the ADA. Indeed, if a parent has a disability, the DHHS must modify its procedures to accommodate the parent's disability consistent with the ADA. See *In re Hicks/Brown*, 500 Mich at 86. Respondent never identified that she had a disability for which she needed an accommodation. Accordingly, the trial court did not plainly err by failing to find that the case service plan was inadequate because it did not include additional reasonable efforts or accommodations under the ADA. See *In re Utrera*, 281 Mich App at 8-9.

Ultimately, the record showed that it was not for a lack of active efforts by the DHHS that respondent was unable to overcome the barriers to reunification, but respondent's failure to engage that prevented reunification. The DHHS was not required to make endless active efforts to reunify the family; "there comes a time when the [DHHS] or the tribe may justifiably pursue termination without providing additional services." *In re JL*, 483 Mich at 326-327. Moreover, when reviewing whether the DHHS provided active efforts, courts must look at the entire record; there is no temporal component that requires more active efforts at one stage than another. See *id*. at 324-325. A parent's unwillingness to participate in the case service plan is a factor to consider when determining whether the DHHS made active efforts. See *Ronald H v Alaska Dep't of Health & Social Servs*, 490 P3d 357, 366 (Alas, 2021) (stating that a court may consider a parent's demonstrated lack of willingness to participate in treatment, which is particularly relevant when efforts become passive because of a lack of cooperation).[4] The record overwhelmingly supports the trial court's findings underlying its determination that the DHHS made active efforts to reunify respondent with her family. See *In re Beers*, 325 Mich App at 677.

## IV. SUSPENDED PARENTING TIME

Respondent finally argues that the trial court abused its discretion when it suspended her parenting time. Although we conclude that the trial court failed to make the requisite findings to suspend parenting time, respondent has failed to demonstrate that such error requires reversal.

Because this claim of error is not preserved, respondent must demonstrate that it amounted to plain, outcome-determinative error. See *In re Utrera*, 281 Mich App at 8-9. A parent is entitled to have in-person parenting time with her children even after removal of the children from her care unless the trial court suspends parenting time. See *In re Ott*, 344 Mich App 723, 737-743; 2 NW3d 130 (2022). The trial court may only suspend parenting time if the court finds that the parent's parenting time would be harmful to the child's life, physical health, or mental well-being, even if supervised. *Id*. at 741; see also MCL 712A.13a(13); MCR 3.965(C)(7).

Respondent argues that the trial court violated MCL 712A.13a(13) by suspending her parenting time without making the requisite finding of harm. We agree. The trial court suspended respondent's parenting time in December 2022 after it heard testimony regarding respondent's failure to comply with parenting-time visits over three dispositional review hearings. The trial court granted the DHHS's request to suspend parenting-time visits after agreeing with the arguments presented by the DHHS and the lawyer-guardian ad litem that it was no longer safe and appropriate for the children to have even supervised parenting time with respondent. However, when the trial court suspended respondent's parenting time, the trial court did not expressly make the requisite findings of harm. Arguably, this was plain error. See *In re Ott*, 344 Mich App at 741. Nevertheless, the trial court's error does not require reversal because the record supported a finding that respondent's no-shows for parenting time were emotionally harming the children.

Over several hearings from September through December 2022, the trial court heard testimony regarding respondent's failure to participate in parenting-time visits. Starting in April

---

[4] Foreign authorities are not binding on this Court, but may be persuasive. See *Franks v Franks*, 330 Mich App 69, 97 n 4; 944 NW2d 388 (2019).

2022, respondent was scheduled to have parenting time twice a week for one hour each visit. Respondent attended only one parenting-time visit in April and the visit lasted 35 minutes because she was late. The supervisor noted that respondent smelled of alcohol and had slurred speech. Following these missed visits, the DHHS required respondent to call in and verify her attendance. Because the children lived some distance from where the visits were to take place, the DHHS began requiring respondent to appear two hours before the start of the parenting-time visits so that in the event respondent did not show, the children would not have to travel and be disappointed when she did not show up. Respondent continued to miss these visits. After continued absences, Johnson asked the trial court to reduce respondent's parenting time to once a week until she completed Dr. Haugen's psychological evaluation. From May through August 2022, respondent attended only three parenting-time visits. When she appeared for parenting-time visits, she tested positive for methamphetamine.

These missed parenting-time visits had a negative impact on the children. Johnson testified that the series of missed parenting-time visits caused the children anxiety. It took two hours for the children to attend a parenting-time session and they had to be taken from school. During these long rides, the children stressed about whether respondent would show and, if she did show, how she would behave. Johnson explained that it was impossible to hide the missed visits because the older children knew that they were supposed to see respondent twice a week. The older children also expressed frustration about having to leave school early to attend the visits and about being in limbo at school depending on whether respondent would show.

Moreover, when respondent showed up to parenting-time visits, she behaved inappropriately. During one parenting-time visit, MH offered respondent help with parenting AB. MH also asked respondent why she was so skinny and inquired about respondent's visible sores. Respondent ignored MH throughout the visit and brushed off MH's questions. Respondent also did not know how to calm AB during these visits. During one episode of AB's distress, MH became very frustrated. Respondent was referred to parenting classes to address these behaviors, but refused to participate. Additionally, testing taken before the visits that did not provide results until after the visits, revealed that respondent was high on methamphetamine during some visits.

The record supported a finding that respondent's no-shows for parenting time were emotionally harming the children. Respondent attended very few parenting-time visits, causing the children anxiety. Even when respondent did show, there was evidence that MH behaved more like the parent than respondent. There was also evidence that respondent was under the influence of substances when she arrived for some parenting visits. It is evident from the totality of the circumstances that the trial court agreed with the arguments by the DHHS and the lawyer-guardian ad litem that it was no longer safe and appropriate for the children to have even supervised parenting time with respondent. If respondent's lawyer had objected to the trial court's failure to make the necessary findings, then the trial court could have readily corrected that oversight.

Additionally, respondent's claims that the suspension of her parenting time was needlessly harmful and prevented her from making progress are belied by the record. The record showed that respondent was not motivated to comply with the case service plan even when she had parenting time. Indeed, she missed more parenting-time visits than she attended. The overwhelming evidence showed that respondent's primary barrier was her unwillingness to address her substance abuse in a timely fashion, and there is no indication that she would have addressed that barrier, but

for the decision to suspend her parenting time. Consequently, respondent has not demonstrated that any error in the trial court's decision to suspend her parenting time amounted to error that affected the outcome of the proceedings. See *In re Utrera*, 281 Mich App at 8-9.

Affirmed.

/s/ Brock A. Swartzle
/s/ James Robert Redford
/s/ Kathleen A. Feeney